**Mary Ann MOLINA, Individually and as Next Friend of Mary Elizabeth Campos, a Minor, Appellants,**

v.

**Shirley P. PIGOTT, M.D., and Detar Hospital, Inc., Appellees.**

No. 13–95–184–CV.

Court of Appeals of Texas, Corpus Christi.

Aug. 22, 1996.

Rehearing Denied Sept. 19, 1996.

**540**

Cage Wavell, Deborah R. Sundermann, Corpus Christi, for Appellants.

Ann P. Watson, Hill, Parker, Franklin & Cardwell, John Roberson, Hill, Parker, Franklin, Cardwell & Jones, Richard M. Law, Nancy Bolin Broaddus, Dunn, Kacal, Adams, Pappas & Law, Houston, for Appellees.

Before DORSEY, FEDERICO G. HINOJOSA, Jr. AND RODRIGUEZ, JJ.

## OPINION

DORSEY, Justice.

Mary Ann Molina appeals a take-nothing judgment entered against her in her suit against Dr. Shirley Pigott and Detar Hospital, Inc., for medical malpractice. We affirm.

Ms. Molina came under Dr. Pigott's prenatal care in January 1989. In August 1989, Ms. Molina was admitted to Detar Hospital for induction of her labor. The delivery of Ms. Molina's daughter was complicated when the fetus's shoulder became lodged against Ms. Molina's pubic bone. Dr. Pigott applied pressure and attempted to rotate the fetus in the birth canal to facilitate the birth. After several medical maneuvers, the fetus was partially delivered along with a prolapsed, or compressed, portion of the umbilical cord. The child was eventually born with a nerve injury, resulting in the limited use of one of her arms.

Ms. Molina sued individually and as next friend of her daughter, alleging that Dr. Pigott and Detar Hospital were negligent and committed malpractice, resulting in injury to her daughter. Following a jury trial, the trial court entered a judgment that Ms. Molina take nothing. Ms. Molina brings a limited appeal complaining of the trial court's failure to strike a potential juror for cause during voir dire, and of the defendant's peremptory strikes, which she claims were racially motivated.

### Failure to Strike Juror for Cause

By her first six points of error, appellant complains that the trial court should have allowed her to strike a potential juror for cause. Appellant argues that one of the venire members, Ms. Ann Miller, was biased as a matter of law. When the trial court refused to strike Ms. Miller, appellant used a peremptory strike to eliminate her from the venire. Appellant requested an additional peremptory strike (which was denied) then objected that she was unable to use that peremptory strike to eliminate Mr. Dennis Paul Speed from the venire, and that it was

error for the trial court to empanel the jury with Mr. Speed sitting as a juror. Appellant thus properly preserved this complaint for our review. *Hallett v. Houston Northwest Medical Ctr.*, 689 S.W.2d 888, 890 (Tex.1985).

Appellant's arguments hinge on whether or not Ms. Miller was in fact biased as a matter of law. If so, the trial court had no discretion in striking her for cause, and the failure to do so was error. *Compton v. Henrie*, 364 S.W.2d 179, 182 (Tex.1963); *Gum v. Schaefer*, 683 S.W.2d 803, 808 (Tex.App.—Corpus Christi 1984, no writ) (per curiam). If not, the trial court had discretion in determining whether or not to strike her, and we will consider any evidence of her bias in a light most favorable to the trial court's ruling. *Gum*, 683 S.W.2d at 807.

■ A person may be disqualified from serving on a jury if they are prejudiced against or in favor of a party to the action. TEX. GOV'T CODE ANN. Sec. 62.105(4) (Vernon 1988); *Garza v. Tan*, 849 S.W.2d 430, 431–32 (Tex.App.—Corpus Christi 1993, no writ). This disqualification extends to bias or prejudice against the subject matter of the suit as well as against the litigants. *Compton*, 364 S.W.2d at 182. Once bias or prejudice is established, a potential juror is disqualified as a matter of law. *Swap Shop v. Fortune*, 365 S.W.2d 151, 154 (Tex.1963); *Gum*, 683 S.W.2d at 807.

■ If prejudice is not established as a matter of law, however, the trial court makes a factual determination as to whether the venireperson is prejudiced enough to merit disqualification. *Swap Shop*, 365 S.W.2d at 154; *Glenn v. Abrams/Williams Bros.*, 836 S.W.2d 779, 782 (Tex.App.—Houston [14th Dist.] 1992, writ denied). This determination is within the discretion of the trial court and will not be overturned absent a showing of abuse. *Sullemon v. U.S. Fidelity & Guar. Co.*, 734 S.W.2d 10, 14–15 (Tex.App.—Dallas 1987, no writ).

■ In order for us to determine that Ms. Miller was disqualified as a matter of law, the record must conclusively show that her state of mind led to the natural inference that she would not act with impartiality. *Compton*, 364 S.W.2d at 182; *Powers v. Palacios*, 794 S.W.2d 493, 495–96 (Tex.App.—Corpus Christi 1990), *rev'd on other grounds*, 813 S.W.2d 489, 491 (Tex.1991). In other words we must find that there "was a *capricious disregard of competent evidence*" of Ms. Miller's bias or prejudice by the trial court. *Sullemon*, 734 S.W.2d at 14–15 (emphasis added). If, on the other hand, "there is a conflict in the evidence, when it can be said that the inferences are not all one way, or when an opinion to the contrary might lawfully be formed," the trial court's refusal to disqualify Ms. Miller may have been appropriate. *Id.*

During voir dire, the attorneys related the general facts of the case to the venire to determine whether any venireperson had experienced a similar situation in childbirth and whether this might cause them to feel biased. Ms. Miller responded to the defense counsel's question of whether anyone had experienced complications with obstetrical care. Ms. Miller initially stated that her experience did not cause her a problem with being able to serve on the jury.

Later, another of the attorneys for the defense asked whether anyone had experienced a prolapsed umbilical cord. Ms. Miller again raised her hand. The attorneys for both sides then questioned Ms. Miller at length regarding her prior experience and whether or not it would cause her to be biased. These exchanges bear repetition at length:

MS. WATSON (for the defense):

Has anyone had any experiences with shoulder dystocia?

What about a prolapsed umbilical cord, a squashed cord?

This baby—as her head came out, the cord appeared smashed up against her face, compressed.

Has anyone had any experience with that problem?

MS. MILLER: (Raised hand.)

MS. WATSON: You have?

MS. MILLER: My son.

MS. WATSON: Is there any reason why your personal experiences might bear on this case one way or the other?

MS. MILLER: I can't honestly say that it wouldn't.

MS. WATSON: It would not?

MS. MILLER: I don't know.

\*     \*     \*     \*     \*     \*

MR. LAW (for the defense):

Ms. Miller—

MS. MILLER: Yes, sir.

MR. LAW: —one of the things that you talked about was your—you had a problem with a prolapsed cord with your son?

MS. MILLER: Uh-huh.

MR. LAW: [D]oes that present any problem with you in being able to sit as a juror in this case?

MS. MILLER: Not in that s[ense]; no, sir.

MR. LAW: Is it too personal or too close to you in order to—

MS. MILLER: No, not about that. Not in that particular way.

MR. LAW: All right.

Is there anything else about your personal experience with delivering children or—

MS. MILLER: Well, I can just, I'll just simply say this. I just thank God he lived.

MR. LAW: All right.

Does he have impairment?

MS. MILLER: No. He was cut. He has scars. But in every other aspect, he is mentally and physically fine.

MR. LAW: How many years ago was this?

MS. MILLER: He will be 20 in February.

MR. LAW: Was he delivered in this area?

MS. MILLER: In Citizens.

MR. LAW: Okay.

I assume by none of the doctors who participated in the care here?

MS. MILLER: No, sir.

MR. LAW: Nothing about that causes you a problem?

You'll be able to sit here?

Okay, thank you.

MS. MILLER: Thank you.

MR. WAVELL (for the plaintiffs):

There were—there's always two sides to everything.

When Mr. Law was asking a question, you said, "No, not about that" and so on as though there is something that does cause you a problem here; and that's what I want to know about?

MS. MILLER: Just like I said, I was just thankful that they were able to save my baby because he almost died inside of me.

MR. WAVELL: See, in this case that concerns me a little bit because with that strong personal experience you have, I think that it may have an overwhelming effect—

MS. MILLER: Right.

MR. WAVELL: —because this girl is quite alive, very cute child.

MS. MILLER: She's precious.

MR. WAVELL: Right. She's not injured at all except for the arm. She has no mental injury. And in that regard, you will probably think, well, she is alive, yet—

MS. MILLER: Oh, yes.

MR. WAVELL: —we are bringing a lawsuit for the disability to her arm.

Now, what type of disability does your son have?

MS. MILLER: None, just [a] scar.

\*     \*     \*     \*     \*     \*

MR. WAVELL: If he had been—I take it you did not sue in that case?

MS. MILLER: Oh, heavens no.

MR. WAVELL: And was it a case where the doctors did all they could?

MS. MILLER: Yes, sir.

MR. WAVELL: And you were glad they were able to help?

MS. MILLER: Yes, sir.

MR. WAVELL: If the evidence shows that the doctors in this case simply didn't do what they should have done, would you have any reluctance to enter a verdict in favor of the child if the evidence shows that that would be fair; or would that experience with you have

such an effect that you probably could not do that?

MS. MILLER: Well, I know everybody could make mistakes.

MR. WAVELL: Right. And, you know, here we're saying a mistake was made; and we want the folks who made it to pay for the injury it caused. We're not, you know, we're willing to say this was just a mistake. Everybody makes mistakes. If you run a stop sign, it was a mistake. You don't have to go to jail, but you have to pay for the damages. That's—so, would you have a problem?

MS. MILLER: Until they came up about the cord, I had no problems; but once that came, it did make it very personal. It bothered me.

MR. WAVELL: Would it be difficult for you to render a verdict?

MS. MILLER: I don't know. I'm being perfectly honest with you in telling you I do not know.

MR. LAW: What we need to know is whether or not you're willing to listen to the evidence?

MS. MILLER: I would be willing to listen to the evidence.

MR. LAW: And answer the questions the judge gives you based upon the evidence in the way he instructs you?

Can you do that?

MS. MILLER: I believe I could.

MR. WAVELL: But, on the other hand, I'm concerned that this personal experience that you have, which is unusual, most folks don't have that kind of experience, has had such an emotional impact upon you and you are so thankful that your son is alive, that in this case you would be more inclined to say, she is also alive. Folks make mistakes. Let's just go on about it even if you're convinced that she did make a mistake.

In other words, if she made a mistake, the instructions are going to be I think pretty clearly for you to find one certain way; but I think you won't have any trouble doing that?

Am I correct in that?

MS. MILLER: There is that possibility. I think I'm intelligent enough to make a decision on the facts; but still, I'm a mother.

MR. WAVELL: I know.

Would you feel more comfortable not being on this jury in view of your personal experience in the past?

You think you could be more fair on another jury where this wasn't the issue?

MS. WATSON: Do you think you could listen to the evidence and evaluate what the evidence is?

MR. WAVELL: Let her answer the question first.

MS. MILLER: I really don't know that it makes that much difference, but I understand where you're—I understand what you're asking.

MR. WAVELL: What I need you to be able to say is that for certain there is no question in your mind that you can be fair and impartial in this case.

MS. MILLER: I think I could[,] listening to the evidence. But this is, you know, be honestly back to the other [sic]. It would always be in the back of my mind.

MR. WAVELL: What do you think that that might have an [e]ffect upon you in all honesty.

MS. MILLER: That's what I'm trying, you know, I don't think that it would but—

MR. WAVELL: You realize there's—

MS. MILLER: I realize that it's there. There is a question there. I think I could be because in teaching I have dealt with many situations and even though I was definitely one way going into a situation, I have been shown that I was not right in the first place.

MR. WAVELL: In view of that, would you feel like you could be more fair on another jury?

MS. MILLER: Probably.

We cannot say that Ms. Miller's answers to the attorney's questions conclusively established her prejudice to the point that it leads to the natural inference that she would not

have acted with impartiality. *Compton*, 364 S.W.2d at 182; *Powers*, 794 S.W.2d at 495–96. Therefore, the trial court was within its discretion in determining that she was able to serve on the jury, and in denying appellant's request for a strike for cause. *Swap Shop*, 365 S.W.2d at 154. "The common thread running through those cases which are reversed on the grounds of trial court error in refusing a challenge for cause for bias is a forthright panelist who admitted bias." H. Lee Godfrey, *Civil Voir Dire in Texas: Winning the Appeal Based on Bias or Prejudice*, 31 S. Tex.L.Rev. 409, 429 (1990). This is not such a case. In this case, Ms. Miller's statements did not conclusively establish that she had a biased or prejudiced state of mind for or against either side, or that she had particularly strong feelings against the subject matter of the litigation. We find that the trial court did not abuse its discretion in failing to excuse Ms. Miller for cause. Appellant's points of error one through six are overruled.

### Batson Hearing

By points of error seven through ten, appellant argues that the trial court erred in denying appellant's *Batson* challenge at trial. At the close of voir dire, appellant noticed that the defendants had used peremptory strikes against four potential jurors with Hispanic surnames: Juan J. Rivera, juror number one; Fabian Perez Gonzales, juror number seventeen; Stacey Lynette Martinez, juror number nineteen; and Ernest Delgado, juror number twenty-six. Appellants requested a *Batson* hearing to determine if these venire members were struck for prohibited discriminatory reasons.

Appellant's counsel testified during the hearing that appellant and her daughter are both of Hispanic descent, and that during voir dire he noticed that the defense counsel had not questioned the Hispanic members of the venire or had only questioned them cursorily. He noted that Dr. Pigott's attorney, Mr. Law, did not question any Hispanic venire members and he opined that there was no reason other than those venire members' ethnic background for defense counsel to have struck them.

Mr. Law responded with the following reasons for challenging the four potential jurors:

1) Mr. Rivera was challenged because of his occupation as a U.S. Postal Service employee for twenty-two years and because his wife is a child-care worker. Mr. Law testified that, in his experience, Postal Service employees are "plaintiff oriented," and he reasoned that Mr. Rivera's wife's occupation would make him "sympathetic toward the plaintiffs."

2) Mr. Gonzales was challenged due to his occupation as a projectionist, his tardy return from lunch during the voir dire process, and his "apparent intelligence level."

3) Ms. Martinez was challenged because of her age (nineteen) and her occupation as an assistant manager trainee at the Playhouse Theater.

4) Mr. Delgado was challenged because of his age (nineteen) and his occupation as a laborer in a lumber company.

Mr. Law noted that he did question Ms. Martinez during the voir dire process, that he did question a number of the other Hispanic venire members, and that several Hispanic venire members were not struck by the defense and were eventually seated on the jury panel. Mr. Law testified that the potential jurors that were struck were challenged because of their age and occupation, Mr. Law's experience with picking jurors, and the other potential jurors available to him in the venire. On cross-examination, Mr. Law admitted that his determinations concerning certain occupations were based on assumptions on his part, but reiterated that his experience and training also played a part in his determination of who to strike.

A party may not strike prospective jurors because of their race. *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986). This prohibition against racially-motivated peremptory strikes applies to civil cases as well as criminal cases. *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 631, 111 S.Ct. 2077, 2088, 114 L.Ed.2d 660 (1991); *Powers v. Palacios*, 813 S.W.2d 489, 491 (Tex.1991); *Benavides v. American Chrome & Chem., Inc.*, 893 S.W.2d

624, 626–27 (Tex.App.—Corpus Christi 1994), *writ denied,* 38 Tex.Sup.Ct.J. 990, 907 S.W.2d 516 (1995) (per curiam). We look to the criminal jurisprudence of Texas for guidance in *Batson* issues. *In the Interest of A.D.E.,* 880 S.W.2d 241, 243 (Tex.App.—Corpus Christi 1994, no writ); *Lott v. City of Fort Worth,* 840 S.W.2d 146, 149 (Tex.App.—Fort Worth 1992, no writ).

When a party appeals the outcome of a *Batson* hearing, the standard of review calls for reversal of trial court rulings that are "clearly erroneous." *Hill v. State,* 827 S.W.2d 860, 865 (Tex.Crim.App.1992); *Whitsey v. State,* 796 S.W.2d 707, 717 (Tex. Crim.App.1989) (opinion on State's motion for rehearing). To determine whether the trial court's ruling was in fact "clearly erroneous," we examine the entire record, in the light most favorable to the court's ruling, in order to determine if we are "left with the 'definite and firm conviction that a mistake has been committed.'" *Hill,* 827 S.W.2d at 865 (citing *U.S. v. Fernandez,* 887 F.2d 564, 567 (5th Cir.1989)); *Camacho v. State,* 864 S.W.2d 524, 528 (Tex.Crim.App.1993). If supported by the record, including the voir dire, the attorney's explanation of his use of a peremptory strike, the rebuttal by appellant, and impeaching evidence, the decision of the trial court will not be clearly erroneous. *Camacho,* 864 S.W.2d at 528 (citing *Vargas v. State,* 838 S.W.2d 552 (Tex.Crim.App.1992)).

In the present case, Mr. Law provided race-neutral explanations for each of the strikes challenged in the *Batson* proceeding. These explanations need not have been plausible in order to satisfy the second step of the *Batson* proceeding. *See Purkett v. Elem,* —— U.S. ——, ——, 115 S.Ct. 1769, 1770, 131 L.Ed.2d 834 (1995). We must accept a facially neutral explanation unless a discriminatory intent is inherent in the explanation. *Interest of A.D.E.,* 880 S.W.2d at 243. The burden then shifts back to the complainant to prove by a preponderance of the evidence that the opposition's explanations are mere pretext for discrimination. *Salazar v. State,* 818 S.W.2d 405, 409 (Tex. Crim.App.1991). The court then determines whether there was a racially motivated strike. *Lott,* 840 S.W.2d at 150.

A panel member may legitimately be struck based on a hunch, for failure to make eye contact, inattentiveness, or other nonquantifiable characteristics. *See Vargas,* 838 S.W.2d at 554–55; *Doby v. State,* 910 S.W.2d 79, 82 (Tex.App.—Corpus Christi 1995, pet. ref'd). In addition, peremptory strikes based on a panel member's employment status are allowed. *See Earhart v. State,* 823 S.W.2d 607, 625 (Tex.Crim.App. 1991); *Tompkins v. State,* 774 S.W.2d 195, 205 (Tex.Crim.App.1987) (en banc), *aff'd,* 490 U.S. 754, 109 S.Ct. 2180, 104 L.Ed.2d 834 (1989) (per curiam) (holding that striking a venire member because of their employment with the U.S. Postal Service was permissible). In the present case, Mr. Law provided race-neutral explanations for his peremptory strikes, and the trial court determined that his strikes did not violate *Batson.* The trial court's decision on the ultimate question of discriminatory intent is to be accorded great deference on appeal, and we will not disturb the ruling unless it is "clearly erroneous." *See Whitsey,* 796 S.W.2d at 726. After reviewing the record, we do not come to that conclusion. Points of error seven through ten are overruled.

By points of error eleven and twelve, appellant claims that the trial court erred in failing to impanel a jury of her peers and in entering judgment on the verdict of an improperly impaneled jury. Appellant does not offer any argument or authority for these two points of error separate from that provided for points of error seven through ten. We therefore read these points of error as an extension of points of error seven through ten, and overrule them for the reasons recited above.

### Conclusion

Finding that the trial court did not err in failing to strike Ms. Miller for cause and in denying appellant's *Batson* challenge, we AFFIRM the judgment of the trial court.