**James Authur DENSEY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 10–04–00049–CR.**

Court of Appeals of Texas, Waco.

March 22, 2006.

Lane D. Thibodeaux, Law Office of Lane D. Thibodeaux, Bryan, for appellant.

Bill R. Turner, Brazos County Dist. Atty., Bryan, for appellee.

Before Chief Justice GRAY, Justice VANCE, and Justice REYNA.

## OPINION ON REHEARING

TOM GRAY, Chief Justice.

Appellant's motion for rehearing is overruled.

Chief Justice GRAY concurs.

Justice VANCE concurs.

TOM GRAY, Chief Justice, concurring.

Densey has filed a Motion for Rehearing. This Court requested a response to the motion. *See* Tex.R.App. P. 49.2. The State filed a response. The Court overrules the motion.

Justices Vance and Reyna would not join this opinion that, to me, seems warranted by the importance of the substantive issue raised by Densey. I have, therefore, provided it as my concurring opinion to the opinion on rehearing. Although I would not ordinarily undertake so lengthy an analysis, I offer it to point out some matters important to the analysis of a *Batson* issue on appeal, and as an example of the type of analysis defense counsel should provide to assist the Court in evaluating a *Batson* issue on appeal.

In Densey's second issue in his original brief, filed September 9, 2004, he contended that "THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT DENIED APPELLANT'S *BATSON* MOTION AS THE STATE VIOLATED THE

EQUAL PROTECTION CLAUSES OF THE UNITED STATES AND TEXAS CONSTITUTIONS." (Densey Br. at 17); *see* U.S. CONST. amend. XIV, § 1; *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); TEX. CONST. art. I, § 3. On June 13, 2005, the United States Supreme Court decided *Miller–El v. Dretke,* in which that Court found a deprivation of equal protection and granted habeas relief on Miller–El's *Batson* claim.[1] *Miller–El v. Dretke,* 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). On July 1, 2005, Densey filed his Supplemental Memorandum Related to Point of Error Number Two, in which he cited *Miller–El.* (Supp.Memo.) In its Memorandum Opinion of July 6, 2005, this Court overruled Densey's second issue. *Densey v. State,* No. 10–04–00049–CR, 2005 WL 1581116, at *1, 2005 Tex.App. LEXIS 5239, at *2–*3 (Tex. App.-Waco July 6, 2005, no pet. h.) (not designated for publication) (op. on orig. submission) (mem.op.).

In Densey's Motion for Rehearing, he raises one ground: "The Memorandum Opinion does not address the effect, if any, of the *Miller–El v. Dretke,* 125 U.S. [sic] 2317 (2005) decision by the Supreme Court of the United States on Appellant's *Batson* challenge." (Mot. Reh'g at 1.) This Court should now do so expressly.

Densey raises two arguments under his ground for rehearing. First, Densey contends, *"The Memorandum Opinion does not address the clearly erroneous standard in light of the Supreme Court's decision in Miller–El."* (Mot. Reh'g at 5 (emphasis in orig.).) Although Densey makes this argument second, I understand it to be his primary argument, and consider it

first. Densey also contends that there is a "[*f*] *actual distinction between the evidentiary record in this case and Gibson v. State, 144 S.W.3d 530 (Tex.Crim.App. 2004).*" (*Id.* at 3 (emphasis in orig.).) I address these arguments in turn.

Under Densey's first contention, as to the standard of review, he argues, "The appellate standard on federal habeas review as articulated in *Miller–El* is more stringent, if not identical to the 'clearly erroneous' standard articulated by the Texas Court of Criminal Appeals in *Gibson.*" (Mot. Reh'g at 6 [ (quoting *Gibson,* 144 S.W.3d at *e.g.* 534) ]). In the Memorandum Opinion on original submission, this Court had cited *Gibson v. Texas* for the proposition that the standard of review on appeal of rulings on *Batson* challenges is "clear[ ] error." *See Densey,* 2005 WL 1581116 at *1, 2005 Tex.App. LEXIS 5239, at *3 (op. on orig. submission) (citing *Gibson* at 533–34). Densey argues:

> *Miller–El* was decided after *Gibson.* *Miller–El* was decided under standards of review related to federal habeas relief. The United States Supreme Court observed the following related to the appellate standard in that case:

> Under the Antiterrorism and Effective Death Penalty Act of 1996, Miller–El may obtain relief only by showing the Texas conclusion to be 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.' 28 U.S.C. § 2254(d)(2). Thus we presume the Texas court's factual findings to be sound unless Miller–El rebuts the 'presumption of correctness

1. Citations and references to *"Miller–El,"* without further qualification, refer to *Miller–El v. Dretke. See Miller–El v. Dretke,* 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). I also cite the Supreme Court's earlier case

concerning Miller–El, *Miller–El v. Cockrell,* as *"Miller–El v. Cockrell." See Miller–El v. Cockrell,* 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003).

by clear and convincing evidence.' § 2254(e)(1).

(Mot. Reh'g at 5 (quoting [*Miller–El,*] 125 S.Ct. at 2325 (quoting 28 U.S.C. § 2254 (2000)) (alterations by Dempsey)).)

The "clearly-erroneous" standard is the correct standard on direct appeal. Several cases have recognized that *Miller–El* implicates only the review of federal habeas-corpus cases, and did not alter the standard of review for cases on direct appeal.

*Miller–El* is a federal habeas case. *Miller–El,* 125 S.Ct. at 2323. Under the federal Antiterrorism and Effective Death Penalty Act, Miller–El could obtain relief only by showing that the state trial court's adjudication was "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *see Miller–El* at 2325. On habeas review, "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1); *see Miller–El* at 2325. A habeas "applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*

The highest court of at least one state has held that the *Miller–El* cases implicate only the standard of review by habeas corpus, not by direct appeal. Referring to another Minnesota case, the Minnesota Supreme Court wrote:

> [The appellant']s argument seems to be that the rationale and holding in the decision on direct appeal have been

called into question by the United States Supreme Court opinion in *Miller–El v. Cockrell,* 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003), and our decision in *State v. Reiners,* 664 N.W.2d 826 (Minn.2003). However, neither case alters the *Batson* analysis applied on direct appeal in this case. *Miller–El* involves the jurisdictional prerequisite for obtaining review of the denial of habeas relief under the federal Antiterrorism and Effective Death Penalty Act of 1996 and is inapplicable here. *See Miller–El,* 537 U.S. at 327, 123 S.Ct. 1029. Cf. *Patterson v. State,* 670 N.W.2d 439, 441 n. 1 (Minn.2003) (stating that *Miller–El* was inapplicable to the standard of review of a postconviction petition.)

*Taylor v. State,* 691 N.W.2d 78, 79 n. 1 (Minn.2005).[2]

Moreover, *Miller–El* did not alter the standard of review of *Batson* challenges on direct appeal. At least one Texas case has held that "*Miller–El* reaffirms prior case law that prohibited disparate treatment among jurors and did not announce any new elements or criteria for determining a *Batson* claim." *Fultz v. State,* No. 03–03–00614–CR, 2005 WL 3440736, at *4, 2005 Tex.App. LEXIS 10445, at *10 (Tex.App.-Austin Dec. 16, 2005, pet. ref'd) (not designated for publication) (mem.op.).[3]

The Fifth Circuit, too, has correctly stated that in *Miller–El* the Supreme "Court did not announce any new elements or

---

2. *See also People v. Coulter,* 345 Ill.App.3d 81, 278 Ill.Dec. 843, 799 N.E.2d 708, 711–712 (2003), *cert. denied,* 125 S.Ct. 2928, 162 L.Ed.2d 865 (2005); *but see Commonwealth v. Morris,* 573 Pa. 157, 822 A.2d 684, 701 (2003) (Castille, J., concurring) (*Miller–El v. Cockrell* "demonstrates just how changeable and unpredictable the federal appeal standard is").

3. *See also, e.g., Peetz v. State,* 180 S.W.3d 755, 760 n. 2 (Tex.App.-Houston [14th Dist.] 2005, no pet.); *Villegas v. State,* No. 03–04–00689–CR, 2005 WL 2679584 at *6, 2005 Tex.App. LEXIS 8737, at *19 (Tex.App.-Austin Oct. 20, 2005, no pet.) (not designated for publication) (mem.op.); *Stewart v. State,* 176 S.W.3d 856, 858 (Tex.App.-Houston [1st Dist.] 2005, no pet.).

criteria for determining a *Batson* claim." *Murphy v. Dretke*, 416 F.3d 427, 439 (5th Cir.2005), *cert. denied*, 126 S.Ct. 1028, 163 L.Ed.2d 868 (2006).[4] The Fifth Circuit notes, however:

> We are aware that we file this opinion less than one month after the Supreme Court handed down its decision in *Miller–El v. Dretke*, in which a six-justice majority of the Supreme Court reversed a decision of another panel of this Court—which had affirmed both the state court's and federal district court's determination that the petitioner Miller–El should not receive relief on his *Batson* claim. In doing so, the Court considered the type and quantum of record evidence required to demonstrate a *Batson* violation. The Court did not announce any new elements or criteria for determining a *Batson* claim, but rather simply made a final factual and evidentiary determination of that particular petitioner's *Batson* claim pursuant to the "demanding but not insatiable" standard set forth in 28 U.S.C. § 2254(d)(2) and (e)(1). *Miller–El* [*v. Dretke* ] at 2325.

*Murphy*, 416 F.3d at 439 (some internal citations omitted).[5]

*Miller–El* recounts the development of the *Batson* standard of review in this way, in accordance with the Supreme Court's prior cases. The Equal Protection Clause provides that "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. "[F]or more than a cen-

tury," the Supreme "Court consistently and repeatedly has reaffirmed that racial discrimination by the State in jury selection offends the Equal Protection Clause." *Miller–El*, 125 S.Ct. at 2324 (quoting *Georgia v. McCollum*, 505 U.S. 42, 44, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992)); *see Batson v. Kentucky*, 476 U.S. 79, 92–93, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *Strauder v. West Virginia*, 100 U.S. 303, 25 L.Ed. 664 (1879). "The rub has been the practical difficulty of ferreting out discrimination in selections discretionary by nature, and choices subject to myriad legitimate influences...." *Miller–El* at 2324. First, in *Swain v. Alabama*, the Supreme "Court tried to relate peremptory challenge to equal protection by presuming the legitimacy of prosecutors' strikes except in the face of a longstanding pattern of discrimination: when 'in case after case, whatever the circumstances,' no blacks served on juries, then 'giving even the widest leeway to the operation of irrational but trial-related suspicions and antagonisms, it would appear that the purposes of the peremptory challenge [were] being perverted.'" *Id.* (quoting *Swain v. Alabama*, 380 U.S. 202, 223–24, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965)) (alteration in *Miller–El* ). "*Swain's* demand to make out a continuity of discrimination over time, however, turned out to be difficult to the point of unworkable, and in *Batson v. Kentucky*," the Supreme Court "recognized that this requirement to show an extended pattern imposed a 'crippling burden of proof' that left prosecutors' use of peremp-

---

4. *See also, e.g., Majid v. Portuondo*, 428 F.3d 112, 131 (2d Cir.2005); *Guidry v. Dretke*, 429 F.3d 154, 160–61 (5th Cir.2005) (denial of reh'g en banc) (per curiam).

5. The Fifth Circuit concludes sharply:
   We recognize that *Miller–El* [*v. Dretke* ] may be the first ring of the death knell for peremptory challenges, [*Miller–El v. Dretke*, 125 S.Ct.] at 2342–44 (Breyer, J., concur-

ring), and that the Supreme Court may well grant *certiorari* in this case to finally bury the concept of peremptory challenges. We see nothing in *Miller–El* [*v. Dretke]*, however, that compels us to reach that conclusion here in *Murphy* and leave it to the Supreme Court to say whether *Miller–El* [*v. Dretke* ] will extend that far.
   *Murphy*, 416 F.3d at 439.

tories 'largely immune from constitutional scrutiny.' " *Miller–El* at 2324 (quoting *Batson* at 92–93, 106 S.Ct. 1712). "Hence *Batson*'s explanation that a defendant may rely on 'all relevant circumstances' to raise an inference of purposeful discrimination." *Id.* at 2325 (quoting *Batson* at 96–97, 106 S.Ct. 1712). The term "[a]ll relevant circumstances" includes " 'the totality of the relevant facts' about a prosecutor's conduct during the defendant's own trial." *Id.* at 2324 (quoting *Batson* at 94, 96, 106 S.Ct. 1712).

The Supreme Court restates *Batson* procedure in this way, again in accordance with its prior cases.

(1) First, the defendant must "make out a prima facie case of discriminatory jury selection by 'the totality of relevant facts.' " *Miller–El,* 125 S.Ct. at 2325 (quoting *Batson,* 476 U.S. at 94, 96, 106 S.Ct. 1712); *accord Miller–El v. Cockrell,* 537 U.S. at 328, 123 S.Ct. 1029; *Hernandez v. New York,* 500 U.S. 352, 358, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality op.).

(2) " 'Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging ... jurors' within an arguably targeted class." *Miller–El* at 2324 (quoting *Batson* at 97, 106 S.Ct. 1712); *accord Miller–El v. Cockrell* at 328, 123 S.Ct. 1029; *Purkett v. Elem,* 514 U.S. 765, 767–69, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995)

(per curiam); *Hernandez* at 358–59, 111 S.Ct. 1859. Then, "the prosecutor must give a clear and reasonably specific explanation of his legitimate reasons for exercising the challeng[e]." [6] *Miller–El* at 2324 (quoting *Batson* at 98 n. 20, 106 S.Ct. 1712) (alteration in *Miller–El* ); *accord Miller–El v. Cockrell* at 328, 123 S.Ct. 1029; *Purkett* at 767–69, 115 S.Ct. 1769; *see Hernandez* at 359–61, 111 S.Ct. 1859.

(3) Lastly, "[t]he trial court then will have the duty to determine if the defendant has established purposeful discrimination." [7] *Miller–El* at 2325 (quoting *Batson* at 98, 106 S.Ct. 1712); *accord Miller–El v. Cockrell* at 328–29, 123 S.Ct. 1029; *Purkett* at 767–68, 115 S.Ct. 1769; *Hernandez* at 359, 363–64, 111 S.Ct. 1859.

After reviewing the evidence, the *Miller–El* Court holds that "when th[e] evidence on the issues raised is viewed cumulatively its direction is too powerful to conclude anything but discrimination." *Miller–El,* 125 S.Ct. at 2339. That Court summarizes the evidence:

In the course of drawing a jury to try a black defendant, 10 of the 11 qualified black venire panel members were peremptorily struck. At least two of them ... were ostensibly acceptable to prosecutors seeking a death verdict, and [one] was ideal. The prosecutors' chosen race-neutral reasons for the strikes do

---

**6.** In his concurrence, Justice Breyer describes that explanation as the "prosecutor's instinctive judgment—the underlying basis for which may be invisible even to the prosecutor exercising the challenge." *Miller–El,* 125 S.Ct. at 2341 (Breyer, J., concurring).

**7.** In his concurrence, Justice Breyer calls the trial court's "task of second-guessing" the prosecutor's judgment "awkward" and "sometime hopeless." *Miller–El,* 125 S.Ct. at

2341 (Breyer, J., concurring). Thus, quoting Justice Thurgood Marshall, Breyer concludes, "the only way to 'end the racial discrimination that peremptories inject into the jury-selection system' ... [i]s to 'eliminat[e] peremptory challenges entirely.' " *Id.* at 2340 (quoting *Batson,* 476 U.S. at 102–103, 106 S.Ct. 1712 (Marshall, J., concurring)) (last alteration in *Miller–El* (Breyer, J., concurring)).

not hold up and are so far at odds with the evidence that pretext is the fair conclusion, indicating the very discrimination the explanations were meant to deny. The strikes that drew these incredible explanations occurred in a selection process replete with evidence that the prosecutors were selecting and rejecting potential jurors because of race.

*Id.* That Court then concludes, "It blinks reality to deny that the State struck [panelists] Fields and Warren, included in that" ten, "because they were black." [8] *Id.* at 2340.

In *Miller–El,* the Supreme Court states five reasons for finding a deprivation of equal protection, as follows. *Miller–El,* 125 S.Ct. at 2325–40.

The first reason is the "bare statistics." *Miller–El,* 125 S.Ct. at 2325. "Out of 20 black members of the 108–person venire panel for Miller–El's trial, only 1 served. Although 9 were excused for cause or by agreement, 10 were peremptorily struck by the prosecution. 'The prosecutors used their peremptory strikes to exclude 91% of the eligible African–American venire members....'" *Id.* (quoting *Miller–El v. Cockrell,* 537 U.S. at 340, 123 S.Ct. 1029) (ellipsis in *Miller–El v. Dretke* ). As Justice Kennedy put it in the Supreme Court's earlier opinion in the case, *Miller–El v. Cockrell,* "Happenstance is unlikely to produce this disparity." *Id.* (quoting *Miller–El v. Cockrell* at 340, 123 S.Ct. 1029).

The next reason is the results of the "comparative juror analysis" or "side-by-side comparisons." *Miller–El,* 125 S.Ct. at 2325. The Supreme Court calls this analysis "more powerful" than the statistics, and

devotes most of the opinion to it. *Id.; id.* at 2325–32. This comparative analysis is one of the ways in which *Miller–El* might affect Texas law.

"If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." *Miller–El,* 125 S.Ct. at 2325.

The *Miller–El* Court analyzes two of the panelists whom the State struck in that case, Fields and Warren.

As to Fields, the primary reason that the State gave for striking him was his belief that anyone can be rehabilitated. When pressed on rehabilitation, the prosecutor added that Fields's brother had a criminal conviction.

As to rehabilitation, the Supreme Court notes "[t]he unlikelihood that [Fields']s position on rehabilitation had anything to do with the peremptory strike of Fields...." *Miller–El,* 125 S.Ct. at 2328. The Supreme Court states that "the credibility of reasons given can be measured by 'how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.'" *Id.* at 2329 (quoting *Miller–El v. Cockrell,* 537 U.S. at 339, 123 S.Ct. 1029). According to that Court, Fields "expressed unwavering support for the death penalty" but the prosecutor struck him, while the prosecutor "accepted with no evident reservations" "a number of white panel members" about whom the prosecutor "should have worried." *Miller–El* at 2326, 2327.

---

**8.** Justice Souter uses "blink" in the sense of "close one's eyes to." *See* WEBSTER'S THIRD INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED 234 (Philip Babcock Gove ed.1993) ("deny recognition to," "deliberately evade", or "ignore"; *e.g.,* as used "of a sporting dog," "to refuse to see and point (game)").

[W]hen we look for nonblack jurors similarly situated to Fields, we find strong similarities as well as some differences. But the differences seem far from significant, particularly when we read Fields's *voir dire* testimony in its entirety. Upon that reading, Fields should have been an ideal juror in the eyes of a prosecutor seeking a death sentence, and the prosecutors' explanations for the strike cannot reasonably be accepted.

*Id.* at 2329.

The State gave as its reason for striking Fields:

"[W]e ... have concern with reference to some of his statements as to the death penalty in that he said that he could only give death if he thought a person could not be rehabilitated and he later made the comment that any person could be rehabilitated if they find God or are introduced to God and the fact that we have a concern that his religious feelings may affect his jury service in this case."

*Miller–El,* 125 S.Ct. at 2327 (quoting App. at 197) [9] (alterations in *Miller–El* ).

In Fields's juror questionnaire, he stated that "he believed in capital punishment." *Miller–El,* 125 S.Ct. at 2326. In his voir-dire testimony, he testified to, as the Supreme Court paraphrases it, "his belief that the State acts on God's behalf when it imposes the death penalty": " '[I]f the State exacts death, then that's what it should be.' " *Id.* (quoting App. at 174).

Yet the Supreme Court found that "nonblack jurors whose remarks on rehabilitation could well have signaled a limit on their willingness to impose a death sentence were not questioned further and drew no objection, but the prosecution ex-

pressed apprehension about a black juror's belief in the possibility of reformation...." *Miller–El,* 125 S.Ct. at 2338. That Court points to the testimony of the following white panelists, *id.* at 2327:

- Hearn "said that she believed in the death penalty 'if a criminal cannot be rehabilitated and continues to commit the same type of crime.' " *Id.* (quoting App. at 429). Hearn

  went so far as to express doubt that at the penalty phase of a capital case she could conclude that a convicted murderer "would probably commit some criminal acts of violence in the future." "People change," she said, making it hard to assess the risk of someone's future dangerousness. "[T]he evidence would have to be awful strong."

*Id.* (quoting App. at 440) (internal citations omitted) (alteration in *Miller–El* ).

"But the prosecution did not respond to Hearn the way it did to Fields, and without delving into her views about rehabilitation with any further question, it raised no objection to her serving on the jury." *Miller–El* at 2327.

- Witt "said she would take the possibility of rehabilitation into account in deciding at the penalty phase of the trial about a defendant's probability of future dangerousness." *Id.* "[T]he prosecutors asked her no further questions about her views on reformation, and they accepted her as a juror." *Id.* at 2327–28.

The Supreme Court also points to the testimony of one "Latino venireman" who served on the jury, *Miller–El,* 125 S.Ct. at 2328:

9. The appendix constitutes the extracts from the record filed in the U.S. Supreme Court. Sup.Ct. R. 26.1; *see* App., *Miller–El,* 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (No. 03–9659), 2004 WL 2899955 (pp. i-iv, 1–486), 2004 WL 2891870 (pp. 487–1052).

- Gutierrez "would consider the death penalty for someone who could not be rehabilitated." *Id.* "[T]he prosecutors did not question him further about this view." *Id.*

The Supreme Court acknowledges, "at one point in the questioning, Fields indicated that the possibility of rehabilitation might be relevant to the likelihood that a defendant would commit future acts of violence." *Miller–El,* 125 S.Ct. at 2326. Fields testified, "If for some reason the testimony didn't warrant death, then life imprisonment would give an individual an opportunity to rehabilitate." *Id.* (quoting App. at 185).

In this regard, the Supreme Court accuses the prosecutor of misstating the record. That Court states, "Perhaps [the prosecutor] misunderstood, but unless he had an ulterior reason for keeping Fields off the jury we think he would have proceeded differently." *Miller–El,* 125 S.Ct. at 2327.

The other reason the State gave for striking Fields was Fields's brother's criminal history. The Supreme Court concludes that, that explanation "reeks of afterthought." *Miller–El,* 125 S.Ct. at 2328.

The Supreme Court states that "[t]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination." *Miller–El,* 125 S.Ct. at 2328 (quoting *Ex parte Travis,* 776 So.2d 874, 883 (Ala. 2000)).

Fields testified as follows concerning his brother's criminal history:

"Q Could you tell me a little bit about that?"

"A He was arrested and convicted on [a] number of occasions for possession of a controlled substance."

"Q Was that here in Dallas?"

"A Yes."

"Q Was he involved in any trials or anything like that?"

"A I suppose of sorts. I don't really know too much about it."

"Q Was he ever convicted?"

"A Yeah, he served time."

"Q Do you feel that that would in any way interfere with your service on this jury at all?"

"A No."

*Miller–El,* 125 S.Ct. at 2327 (quoting App. at 190) (alteration in *Miller–El* ).

The other strike on which the Supreme Court performs a comparative analysis is Warren. At the *Batson* hearing after remand, the prosecutor gave the following reason for striking Warren:

I thought [Warren's statements on *voir dire* ] were inconsistent responses. At one point he says, you know, on a case-by-case basis and at another point he said, well, I think—I got the impression, at least, that he suggested that the death penalty was an easy way out, that they should be made to suffer more.

*Miller–El,* 125 S.Ct. at 2329 (quoting App. at 909) (alteration in *Miller–El* ).

On voir dire, when asked "what the death penalty accomplished," *Miller–El,* 125 S.Ct. at 2329, Warren testified:

I don't know. It's really hard to say because I know sometimes you feel that it might help to deter crime and then you feel that the person is not really suffering. You're taking the suffering away from him. So it's like I said, sometimes you have mixed feelings about whether or not this is punishment

or, you know, you're relieving personal punishment.

*Id.* (quoting 3 R. at 1532).

The Supreme Court points to the State's "failure to object to other panel members who expressed views much like Warren's." *Miller–El,* 125 S.Ct. at 2329. "The fact that [the prosecutor]'s reason also applied to these other panel members, most of them white, none of them struck, is evidence of pretext." *Id.* at 2330. The Court points to the following panelists' testimony:

- Duke: "[S]ometimes death would be better to me than—being in prison would be like dying every day and, if you were in prison for life with no hope of parole, I['d] just as soon have it over with than be in prison for the rest of your life." *Id.* at 2329–30 (quoting App. at 372) (second alteration in *Miller–El* ).
- Woods ("the one black panelist to serve as juror," *Miller–El* at 2330): "[C]apital punishment 'is too easy. I think that's a quick relief. . . . I feel like [hard labor is] more of a punishment than putting them to sleep.'" *Id.* (quoting App. at 408) (second alteration in *Miller–El* ).
- Jenkins: "[A] harsher treatment is life imprisonment with no parole." *Id.* (quoting App. at 542).
- Girard: "[L]iving sometimes is a worse—is worse to me than dying would be." *Id.* (quoting App. at 624).

The State also alleged that it struck Warren because of Warren's brother-in-law's criminal history. *Miller–El,* 125

S.Ct. at 2330 n. 8. The brother-in-law was "convicted of a crime having to do with food stamps for which he had to make restitution." *Id.* The Supreme Court notes that the State "never questioned Warren about his errant relative at all." *Id.* "[T]he failure to ask undermines the persuasiveness of the claimed concern." *Id.* That Court points to the following "comparable," *id.,* testimony:

- "Davis's husband had been convicted of theft and received seven years' probation." *Id.*
- "Nix's brother was involved in white-collar fraud." *Id.*
- "Vickery's sister served time in a penitentiary several decades ago." *Id.*

The next reason the Supreme Court gives for finding a deprivation of equal protection in *Miller–El* is a "pattern[ ] of practice," *Miller–El,* 125 S.Ct. at 2332, the jury shuffle. That Court finds: "At least two of the jury shuffles conducted by the State make no sense except as efforts to delay consideration of black jury panelists to the end of the week, when they might not even be reached." *Id.* at 2339. In particular, that Court points to the fact that the State did not give any reason for requesting a jury shuffle: [10] "The State notes in its brief that there might be racially neutral reasons for shuffling the jury, and we suppose there might be. But no racially neutral reason has ever been offered in this case, and nothing stops the suspicion of discriminatory intent from rising to an inference." *Id.* at 2333.

The next reason for which the Supreme Court finds a deprivation of equal protec-

---

**10.** Of course, there is no requirement of or even a procedure for giving a reason for a jury shuffle. *See* Tex.Code Crim. Proc. Ann. art. 35.11 (Vernon Supp.2005) ("on demand"). The Texas Court of Criminal Appeals has held that *Batson* does not apply to shuffles. *Ladd v. State,* 3 S.W.3d 547 (Tex.Crim.App.1999);

*but see* Alan L. Levy, *Petit Jury Selection and Composition, in* State Bar of Tex. Prof. Dev. Program, Advanced Criminal Law Course 15, at 15–39 (2005) ("There is a strong probability that *Batson* will be extended to jury shuffles.") (citing *Miller–El* ).

tion in *Miller–El* is the State's "contrasting *voir dire* questions." *Miller–El,* 125 S.Ct. at 2333. The first sort of such questions concerns the panelists' "[t]houghts on capital punishment." *Id.* Some of "the prosecutors' statements preceding questions about a potential juror's thoughts on capital punishment" "were cast in general terms, but some followed the so-called graphic script, describing the method of execution in rhetorical and clinical detail." *Id.*

"[F]or 94% of white venire panel members, prosecutors gave a bland description of the death penalty before asking about the individual's feelings on the subject." *Miller–El,* 125 S.Ct. at 2334. For example:

> "I feel like it [is] only fair that we tell you our position in this case. The State of Texas ... is actively seeking the death penalty in this case for Thomas Joe Miller–El. We anticipate that we will be able to present to a jury the quantity and type of evidence necessary to convict him of capital murder and the quantity and type of evidence sufficient to allow a jury to answer these three questions over here in the affirmative. A yes answer to each of those questions results in an automatic death penalty from Judge McDowell."

*Id.* at 2334 (quoting App. at 564–65) (alterations in *Miller–El*).[11]

On the other hand, "[o]nly 6% of white venire panelists, but 53% of those who were black, heard a different description of the death penalty...." *Miller–El,* 125 S.Ct. at 2334. For example:

> "I feel like you have a right to know right up front what our position is.

[We], representing the people of Dallas County and the state of Texas, are actively seeking the death penalty for Thomas Joe Miller–El...."

> "We do that with the anticipation that, when the death penalty is assessed, at some point Mr. Thomas Joe Miller–El— the man sitting right down there—will be taken to Huntsville and will be put on death row and at some point taken to the death house and placed on a gurney and injected with a lethal substance until he is dead as a result of the proceedings that we have in this court, on this case. So that's basically our position going into this thing."

*Id.* (quoting App. at 572–73) (ellipsis in *Miller–El*).

The other "contrasting *voir dire* questions" in *Miller–El* concerned the range of punishment. The Supreme Court calls this questioning "trickery" and a "ruse." *Miller–El,* 125 S.Ct. at 2337, 2338 n. 34. "The prosecutors asked members of the panel how low a sentence they would consider imposing for murder. Most potential jurors were first told that Texas law provided for a minimum term of five years...." *Id.* at 2337.[12] "[B]ut some members of the panel were not, and if a panel member then insisted on a minimum above five years, the prosecutor would suppress his normal preference for tough jurors and claim cause to strike." *Id.; see Johnson v. State,* 982 S.W.2d 403, 405 (Tex.Crim.App.1998). "Ninety-four percent of whites were informed of the statutory minimum sentence, compared [with] only twelve and a half percent of African–Americans." *Miller–El* at 2337 (quoting

11. *See* Act of May 28, 1979, 63d Leg., R.S., ch. 426, art. 3, § 1, sec. (b)(2), 1973 Tex. Gen. Laws 1122, 1125 (amended 1991) (current version at Tex.Code Crim. Proc. Ann. art. 37.071, § 2(b)(2) (Vernon Supp.2005)) (spe-

cial issues in capital murder punishment trial).

12. *See* Tex. Penal Code Ann. §§ 12.32(a), 19.02(c) (Vernon 2003) (punishment range).

*Miller–El v. Cockrell,* 537 U.S. at 345, 123 S.Ct. 1029) (alteration in *Miller–El v. Dretke* ).

The last reason for which the Supreme Court found a deprivation of equal protection in *Miller–El* was the State's "policy." *Miller–El,* 125 S.Ct. at 2338–39. That Court states, "We know that for decades leading up to the time this case was tried prosecutors in the Dallas County office had followed a specific policy of systematically excluding blacks from juries...." [13] *Id.* at 2338. That Court cites the testimony of two witnesses:

"A Dallas County district judge testified that, when he had served in the District Attorney's Office from the late–1950's to early–1960's, his superior warned him that he would be fired if he permitted any African–Americans to serve on a jury. Similarly, another Dallas County district judge and former assistant district attorney from 1976 to 1978 testified that he believed the office had a systematic policy of excluding African–Americans from juries."

*Id.* at 2338–39 (quoting *Miller–El v. Cockrell* at 334, 123 S.Ct. 1029).

"Of more importance, the defense presented evidence that the District Attorney's Office had adopted a formal policy to exclude minorities from jury service.... A manual entitled 'Jury Selection in a Criminal Case' [sometimes known as the Sparling Manual] was distributed to prosecutors. It contained an article authored by a former prosecutor (and later a judge) under the direction of his superiors in the District Attorney's Office, outlining the reasoning for excluding minorities from jury service. Although the manual was written in 1968, it remained in circulation until 1976, if not later, and was available at least to one of the prosecutors in Miller–El's trial."

*Miller–El,* 125 S.Ct. at 2339 (quoting *Miller–El v. Cockrell* at 334–35, 123 S.Ct. 1029) (alterations in *Miller–El v. Dretke* ).

There are at least two ways in which *Miller–El v. Dretke* may somewhat modify how Texas appellate courts evaluate *Batson* cases: (1) the degree of similarity required in the comparative analysis, and (2) the insistence that the courts analyze the precise reasons given by the State for the State's strikes.

The first of these modifications to the *Batson* analysis pertains to the "comparative juror analysis" or "side-by-side comparison[ ]." *See Miller–El,* 125 S.Ct. at 2325. In his dissent in *Miller–El,* Justice Thomas criticized the majority's compara-

---

**13.** Justice Souter says, "we know," even " '[ ]though most of the witnesses [presented at the *Swain* hearing in 1986] denied the systematic policy to exclude African–Americans....' " *Miller–El,* 125 S.Ct. at 2338 (quoting *Miller–El v. Cockrell,* 537 U.S. at 334–35, 123 S.Ct. 1029) (second alteration in *Miller–El v. Cockrell* ); *see Swain,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759. The Supreme Court notes, however, "others disagreed," citing the testimony of two witnesses. *Miller–El* at 2338. The only evidence that Court cites that prosecutors in Miller–El's trial were following the policy manual is that they recorded the race of the juror on the juror information card, as the manual instructed. *Id.* at 2339, 2340. As Justice Thomas notes in his dissent: "The majority ... tars prosecutors with a manual entitled Jury Selection in a Criminal Case (hereinafter Manual or Sparling Manual), authored by John Sparling, a former Dallas County prosecutor. There is no evidence, however, that" the trial prosecutors "had ever read the Manual—which was written in 1968, almost two decades before Miller–El's trial." *Miller–El,* 125 S.Ct. at 2362 (Thomas, J., dissenting). "The reason there is no evidence on the question is that Miller–El never asked. During the entire *Batson* hearing, there is no mention of the Sparling Manual.... The majority simply assumes that all Dallas County prosecutors were racist and remained that way through the mid–1980's." *Id.*

tive analysis of the State's reason for striking Warren. *Miller–El,* 125 S.Ct. at 2354 (Thomas, J., dissenting); *see Miller–El,* 125 S.Ct. at 2326–29. Justice Thomas writes:

> The majority thinks it can prove pretext by pointing to white veniremen who match only one of the State's proffered reasons for striking Warren. [*Miller–El v. Dretke* ] at 2329–2330. This defies logic. " 'Similarly situated' does not mean matching any one of several reasons the prosecution gave for striking a potential juror—it means matching *all* of them." *Miller–El* [*v. Cockrell* ], 537 U.S., at 362–363, 123 S.Ct. 1029, 154 L.Ed.2d 931 (THOMAS, J., dissenting). Given limited peremptories, prosecutors often must focus on the potential jurors most likely to disfavor their case. By ignoring the totality of reasons that a prosecutor strikes any particular venireman, it is the majority that treats potential jurors as "products of a set of cookie cutters," [*Miller–El v. Dretke* ], at 2329, n. 6—as if potential jurors who share only some among many traits must be treated the same to avoid a *Batson* violation. Of course jurors must not be "identical in all respects" to gauge pretext, [*id.*], but to isolate race as a variable, the jurors must be comparable in all respects that the prosecutor proffers as important. This does not mean "that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror." [*Id.*] It means that a defendant cannot support a *Batson* claim by comparing veniremen of different races unless the veniremen are truly similar.

*Miller–El* at 2354 (Thomas, J., dissenting) (some internal citations omitted).

The majority replied:

> None of our cases announces a rule that no comparison is probative unless the situation of the individuals compared is identical in all respects, and there is no reason to accept one. Nothing in the combination of [the venireman]'s statements about rehabilitation and his brother's history discredits our grounds for inferring that these purported reasons were pretextual. A *per se* rule that a defendant cannot win a *Batson* claim unless there is an exactly identical white juror would leave *Batson* inoperable; potential jurors are not products of a set of cookie cutters.

*Miller–El,* 125 S.Ct. at 2329 n. 6.

Some Texas cases have used reasoning similar to Justice Thomas's:

> As a technique for challenging strike explanations, comparative analysis is strongest when only one characteristic is offered in explanation. Thus, if the prosecutor states that two African–American panelists were struck because his voir dire questioning indicated they were unemployed, but he failed to question non-African-American panelists who had left the employment category blank in their forms, substantial reason to question the genuineness of the strike explanation is presented.

43 GEORGE E. DIX & ROBERT O. DAWSON, TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 35.133, at 554 (2d ed.2001) (citing *Emerson v. State,* 851 S.W.2d 269, 274 (Tex.Crim.App.1993)).

> Even if only one characteristic is given for striking a minority panelist and there was a nonminority panelist to whom the same characteristic might apply, that does not necessarily show racial animus in making the strike. The panelist not struck might also have characteristics for the state that are sufficiently positive to outweigh the negative characteristic.

43 DIX & DAWSON § 35.111, at 554 (citing *Whitsey v. State,* 796 S.W.2d 707, 714 (Tex. Crim.App.1989) (op. on orig. submission)).

When the explanation for the strikes increases in complexity, so that it encompasses several characteristics for each strike, comparative analysis becomes less useful as a challenging tool. The process of decision-making in exercising strikes has been described as "not susceptible to rigid quantification; rather, it is a fluid process, often hinging on the interaction of a number of variables and permutations." The fact that panelists not struck have some, but not all, of the objectionable characteristics does not mean that the strike explanation is not genuine.

43 DIX & DAWSON § 35.111, at 554–55 (quoting *Cantu v. State,* 842 S.W.2d 667, 689 (Tex.Crim.App.1992)).

> [W]hen the State has offered more than one plausible reason for striking a venireperson, it is proper to review these reasons in their entirety in order to assess whether the State's explanation was valid or merely pretextual. Where, as here, the State has offered numerous race neutral reasons for its challenge, we cannot say that the fact that there were other acceptable jurors possessing one or more of these objectionable attributes, is sufficient to establish disparate treatment.

*Cantu,* 842 S.W.2d at 689.

For example, as this Court has held:

> [Appellant] fails to identify any other juror with all of the characteristics for which any of the challenged jurors were struck. Although one may have had a similar job and another may have revealed similar feelings regarding an officer's use of a weapon during a traffic stop, none possessed the same combination of characteristics as any of the challenged jurors.

*Ealoms v. State,* 983 S.W.2d 853, 857 (Tex. App.-Waco 1998, pet. ref'd).

Another possible change is in the degree to which reviewing courts must evaluate the race-neutral reasons that the prosecutor actually gave, and not speculate on reasons that the prosecutor might properly have had.[14] The Texas Court of Criminal Appeals has stated that such is the law in Texas, but neither that Court nor the lower courts have applied that law consistently.

In *Miller–El,* the Supreme Court states that the federal "Court of Appeals pretermitted" the "difficulties" in accepting the State's reasons "by stating that the prosecution's reason for striking Warren was a more general ambivalence about the [death] penalty and his ability to impose it." *Miller–El,* 125 S.Ct. at 2332 (citing *Miller–El v. Dretke,* 361 F.3d 849, 856–57 (5th Cir.2004), *reversed,* 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196). The Supreme Court calls this a "rationalization," *Miller–El* at 2332:

> [T]he rule in *Batson* provides an opportunity to the prosecutor to give the reason for striking the juror, and it requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it. It is true that peremptories are often the subjects of instinct, and it can sometimes be hard to say what the reason is. But when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. A *Batson* challenge

---

**14.** Some commentators have said that *Miller–El* "put teeth in *Batson* " in this regard. Perry A. Craft & Michael G. Sheppard, *Supreme Court Review: What the U.S. Supreme Court's 2004–2005 Decisions Mean to Tennessee Lawyers,* 41 TENN. B.J. 16, 34 (2005) ("[T]he court refused to defer to a prosecutor's post hoc justifications for striking Blacks from juries. . . .").

does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false. The Court of Appeals's and the dissent's substitution of a reason for eliminating [a panelist] does nothing to satisfy the prosecutors' burden of stating a racially neutral explanation for their own actions.

*Id.* at 2331–32 (internal citations omitted).

The Court of Criminal Appeals has held in an opinion denying a petition for discretionary review that "at the core of *Batson,* is the premise that the prosecutor must bring forward his explanation *at trial* for his challenged peremptories...." *Young v. State,* 856 S.W.2d 175, 176 (Tex.Crim.App. 1993) (emphasis in orig.).

"Undoubtedly, it is the prosecutor's obligation to tender such explanations at the time first called upon to do so in the trial court. It is no sufficient substitute to let her [prosecutor] offer them at a later time, certainly not on appeal or discretionary review. And it follows that any subsequent scrutiny by an appellate court of the voir dire process must necessarily be for the limited purpose of determining whether the prosecutor's tendered explanations can be refuted or corroborated and not as a surrogate for the explanations themselves."

*Id.* (quoting *Wright v. State,* 832 S.W.2d 601, 605 (Tex.Crim.App.1992) (Benavides, J., concurring)) (alteration in *Young* ). However, one example of a Texas case in which a court considered a reason for a strike which was not alleged by the prosecutor is *Gibson v. Texas.* *Gibson,* 144 S.W.3d 530. There, the Court of Criminal Appeals noted that, besides the reasons the State alleged to distinguish venirepersons 7 and 11:

Veniremember 7 also stated that he believed a defendant should testify and "explain his part." The trial court could have reasonably determined that this was another race-neutral motivation explaining why the prosecutor would peremptorily strike veniremember 11 but not veniremember 7 and that the defense was overlooking this significant distinction between these two veniremembers.

*Id.* at 534. There are probably many such cases, on the rationale that "if the trial court's decision is correct on any theory of law applicable to the case, the decision will be sustained." *See Barocio v. State,* 158 S.W.3d 498, 501 (Tex.Crim.App.2005); *accord Ex parte Coleman,* 157 Tex.Crim. 37, 44, 245 S.W.2d 712, 717 (1952) (op. on reh'g); *cf. Hailey v. State,* 87 S.W.3d 118, 121 (Tex.Crim.App.2002).

In attempting to apply this law, a recent Texas case has noted that the Supreme "Court emphasized that a trial or appellate court is limited in its review of the prosecutor's stated reason." *Fultz,* 2005 WL 3440736 at *4, 2005 Tex.App. LEXIS 10445, at *10. "A court cannot search for *any* reason, however rational, to support the prosecutor's strike. Rather, it is bound to consider only the prosecutor's stated reason. This preserves the prosecutor's burden to state a racially neutral reason for the strike." *Id.* (emphasis in orig.). "In looking at the genuineness of the State's asserted motive, we are to limit our review to information provided in the *Batson* hearing." *Id.,* 2005 WL 3440736 at *4, 2005 Tex.App. LEXIS 10445, at *11 (citing *Wright,* 832 S.W.2d at 605). The Austin Court, however, while acknowledging that its review was limited to the prosecutor's reasons for the strikes in the record, continued to recognize the necessity of deference to the trial court:

In this case, Fultz's counsel introduced the panel members' criminal histories in an attempt to show that Caucasian, strikeable panel members with "serious" offenses remained on the jury. The issue is whether, when doing the side-by-side analysis required by *Miller–El*, the criminal histories in the record show that Blake was the only panel member struck for having committed a "serious" offense, or whether panel members who were not African–American were struck for their "serious" offenses as well.

The prosecutor's definition of "serious" offenses was far from clear. In defining "serious," we must limit our review to what was established during the *Batson* hearing. When the prosecutor used the word "serious" in the record, he stated that he was targeting "greater than Class A" offenses. The prosecutor then qualified his definition by providing two examples of a "serious" offense: driving while intoxicated, which is in fact a Class B misdemeanor, *see* Tex. Pen.Code Ann. § 49.04(b) (West 2003), and sexual assault, a felony, *see id.* § 22.011(f) (West Supp.2004–05). Taken as a whole, the prosecutor defined "serious" both by explanation and examples. Therefore, the trial court may have reasonably believed that "serious" offenses were not limited to "greater than Class A" offenses, but included certain misdemeanors as well.[*]

In this case, we will defer to the trial court in determining whether "serious" offenses included certain misdemeanors, such as driving while intoxicated. The trial court is in the best position to determine the meaning and sincerity of the parties. Because the State struck panel members who were not African–American with "serious" offenses, the Defendant has not met his burden of establishing that the State's asserted

motive was not genuine. The trial court's ruling was not clearly erroneous.

---

[*] On appeal, the State argues that the prosecutor intended "serious" to mean "an offense that was worse than a Class C misdemeanor." We find this position to be unsupported by the record.

*Fultz*, 2005 WL 3440736, at \*\*4–5, 2005 Tex.App. LEXIS 10445, at \*12–\*14 (some internal citations omitted).

Keeping these modifications in mind, I turn to Densey's case. Densey argues:

> The brief factual review of the record in the Memorandum Opinion fails to address the similarities in this case to *Miller–El* and why, under the facts presented in *Miller–El* under a similar appellate standard, the Supreme Court found a pretext to be so pervasive that it chose the following declarative language:

> > It blinks reality to deny the State struck [the challenged jurors], including in that 91% because they were black. The strikes correlate with no fact as well as they correlate with race and they occurred during a selection effected by shuffling a disparate questioning that race explains better than any race neutral reason advanced by the State.

(Mot. Reh'g at 6 (purporting to quote *Miller–El* at 2340) (alterations by Dempsey).) Under the established standard of review, Densey is not entitled to relief.

Several cases have noted the extraordinary combination of circumstances that contributed to the finding in *Miller–El*. The highest courts of at least two states have done so. The Kentucky Supreme Court, first, noted in *McPherson v. Kentucky*:

> The trial court's decision is entitled to great deference. We recognize that the U.S. Supreme Court recently over-

turned a decision despite such deference, and sustained an equal protection challenge based on racial discrimination in jury selection. However, in *Miller–El v. Dretke*, . . . the defendant presented overwhelming evidence that the prosecutor's neutral explanations were pretextual. Specifically, the defendant had presented evidence that the district attorney's office had a history of systematically attempting to exclude minorities from juries, including testimony that a procedure known as "jury shuffle" had been used by the office in the past specifically to manipulate the racial composition of the jury pool.

Additionally, the Court concluded that some of the prosecutor's proffered explanations for striking African–Americans from the jury pool were equally applicable to white jurors whom the prosecutor declined to peremptorily strike. Moreover, in explaining his reasons for striking these potential jurors, the prosecutor mischaracterized some of the testimony they gave during voir dire. When this mischaracterization was pointed out, the prosecutor offered another reason for the strike rather than respond or defend his initial explanation. The Court found that "it would be difficult to credit the State's new explanation, which reeks of afterthought," supporting the defendant's contention that the prosecutor's neutral explanations were pretextual.

In the instant case, there are no similar circumstances which would indicate that the prosecutor's proffered reasons for his strikes were a pretext for gender discrimination.

*McPherson v. Commonwealth*, 171 S.W.3d 1, 3–4 (Ky.2005) (mem.op.) (internal footnotes omitted) (quoting *Miller–El*, 125 S.Ct. at 2328).

Similarly, the Louisiana Supreme Court held in *Louisiana v. Allen*:

[W]e do not find that the defendant's argument that the State through the exercise of its five peremptory challenges against the African–American jurors effectively excluded "about 62 1/2 percent" of the eight minority persons present on the panel demonstrates a discernable pattern of discriminatory intent or sufficient to rise to the level of discriminatory intent found in *Miller–El v. Dretke* (finding discriminatory intent because (1) State peremptorily struck ten of eleven eligible African–American venire members; (2) State's reasons for exercising peremptory strikes against some African–American panel members appeared equally on point as to some white jurors who served; (3) State's shuffling of the venire panel (at least two of the State's jury shuffles make no sense except as efforts to delay consideration of African–American panelists to the end of the week, when they might not even be reached); (4) State's "enquiry into views on the death penalty" (53% of African–American panelists but only 3% of non-African-Americans were questioned with a graphic script meant to induce qualms about applying the death penalty); (5) State's questioning about acceptable minimum sentences (100% of African–Americans but only 27% of non-African-Americans were subjected to trick questions about minimum accepted penalties for murder); (6) widely known evidence of the general policy of the Dallas County District Attorney's Office to exclude African–American venire members from juries at the time Miller–El's jury was selected (Sparling Manual)).

*State v. Allen*, 03–2418, p. 19, 913 So.2d 788, 803 (La.6/29/05) (internal citations omitted) (quoting *Miller–El*, 125 S.Ct. at 2317, 2325–26, 2332, 2339, 2340).

The federal courts of appeals have similarly distinguished *Miller–El* on its facts. For example, in *Murphy v. Dretke,* the Fifth Circuit held:

> Here, we have thoroughly combed the record of the *voir dire* conducted in Murphy's state court capital murder trial; and our detailed "side-by-side comparisons of black venire panelists who were struck and white panelists allowed to serve" do not indicate that any differences in questioning or treatment resulted from pretextual racial bias. *See Miller–El [v. Dretke* ], 125 S.Ct. at 2325 (noting the evidentiary strength of such close comparisons). Moreover, there is neither evidence in this record of: (i) any, much less multiple, jury shuffles occurring in the state trial court which resulted in the increasingly lower statistical presence of African American venirepersons within the jury venire; nor (ii) a 20–year–old, or indeed any, manual from the State District Attorney and other testimonial evidence suggesting the historic use of peremptory strikes against African–American venirepersons during jury selection, both of which were decisive factors in *Miller–El [v. Dretke]. Id.* at 2332, 2338–40.

*Murphy,* 416 F.3d at 439. Similarly, the Second Circuit has held:

> In this case there is little evidence, certainly not amounting to the "clear and convincing" evidence required, that [the trial judge]'s finding that the petitioners did not establish that the respondents' race-neutral reasons were a pretext for purposeful discrimination was incorrect. Although the petitioners are correct that the statistical profile of jury selection in this case, with twelve of fifteen African–American prospective jurors dismissed, is not dissimilar from that in *Miller–El II,* where ten of eleven African–American prospective jurors were dismissed

peremptorily, *see Miller–El II,* 125 S.Ct. at 2339, the *Miller–El* decisions do not help the petitioners here. In *Miller–El II,* in which the Supreme Court ordered habeas relief based on the petitioner's *Batson* claim, the prosecution failed to provide plausible, race-neutral explanations for its decisions to peremptorily challenge various prospective jurors and not to challenge others. *Id.* at 2340. Neither is there evidence in this case of "broader patterns of [discriminatory] practice" like those found in *Miller–El II,* which included evidence of "jury shuffling"—*i.e.,* "rearranging the order in which members of a venire panel are seated," in order to reduce the number of black jurors—evidence of discriminatory questioning, and "widely known evidence of the general policy of the ... District Attorney's Office to exclude black venire members from juries." *Id.* at 2332.

*Majid,* 428 F.3d at 130–31 (alterations in *Majid* ).

The Austin Court of Appeals distinguished *Miller–El* on its facts in this way:

> In *Miller–El,* the U.S. Supreme Court required a side-by-side comparison of African–American and Caucasian jurors when addressing a race-based *Batson* challenge. *Miller–El v. Dretke,* 545 U.S. 231, ——, 125 S.Ct. 2317, 2325, 162 L.Ed.2d 196 (2005). If "a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination." *Id.* at 2325. In *Miller–El,* the prosecutor had peremptorily stricken an African–American panel member for favoring rehabilitation over the death penalty. *Id.* at 2326–27. However, the record showed "unequivocally" that the panel member believed the death penalty could be imposed without rehabilitation. *Id.* at

2327. More importantly, the record also showed that there were several Caucasian panelists who had reservations against the death penalty because they favored rehabilitation. *Id.*

*Fultz,* 2005 WL 3440736, at *3, 2005 Tex. App. LEXIS 10445, at *9–*10.[15]

In a civil case, too, a Texas court has distinguished *Miller–El. See Davis v. Fisk Elec. Co.,* 187 S.W.3d 570 (Tex.App.-Houston [14th Dist.] 2006, pet. filed). There:

> Fisk shuffled the jury before voir dire. Seven of the twelve African–Americans on the panel were in the top twenty-five of the forty panelists when Fisk shuffled. Based on this fact alone, Davis asserts that "Fisk's decision to shuffle the jury was based solely on its visual appearance" and therefore, under *Miller–El,* erodes the credibility of Fisk's assertion that its strikes were race-neutral. *See Miller–El v. Dretke,* 545 U.S. 231, –– – ––, 125 S.Ct. 2317, 2332–33, 162 L.Ed.2d 196 (2005).

*Davis* at 590. The Fourteenth Court of Appeals held:

> The Court in *Miller–El* held that the prosecutor's shuffles were a factor suggesting discrimination not only because of the predominant number of African–Americans at the front of the panel but also because the prosecution delayed making its objection to the defense's shuffle until after the racial composition of the panel was revealed and the district attorney's office had admitted it had previously shuffled juries to manipulate their racial composition. There is no such additional evidence in this case.

*Id.* (citing *Miller–El,* 125 S.Ct. at 2333).

The facts of the instant case are likewise distinguishable. I find in them nothing comparable to those in *Miller–El.*

The State stands on the reasoning that where "the State has offered numerous race neutral reasons for its challenge," the court "cannot say that the fact that there were other acceptable jurors possessing one or more of these objectionable attributes, is sufficient to establish disparate treatment." (State Br. at 26 (quoting *Cantu,* 842 S.W.2d at 685); *accord* Resp. Mot. Reh'g at 9–10.) This argument is similar to the one that the Supreme Court rejected in *Miller–El. See Miller–El,* 125 S.Ct. at 2329.

Densey argues entirely under *Batson,* without reference to the Texas statute. *See* TEX.CODE CRIM. PROC. ANN. art. 35.261 (Vernon 1989). Under *Batson* and its federal progeny, and the Texas Court of Criminal Appeals's precedent in accordance therewith, " 'the trial court's decision on the ultimate question of discriminatory intent . . .' . . . will not be overturned unless clearly erroneous." *Miller–El v. Cockrell,* 537 U.S. at 340, 123 S.Ct. 1029 (quoting *Hernandez,* 500 U.S. at 364, 111 S.Ct. 1859); *accord Gibson,* 144 S.W.3d at 534; *DeBlanc v. State,* 799 S.W.2d 701, 713 (Tex.Crim.App.1990); *Whitsey,* 796 S.W.2d at 721 (1990) (op. on reh'g) (plurality op.). "To determine whether the factfinder's decision is 'clearly erroneous,' appellate courts look to the record to see if they are 'left with the "definite and firm conviction that a mistake has been committed".' " *Hill v. State,* 827 S.W.2d 860, 865 (Tex. Crim.App.1992) (quoting *United States v. Fernandez,* 887 F.2d 564, 567 (5th Cir. 1989) (quoting *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985))). The trial court's ruling is clearly erroneous when

---

15. *See also, e.g., Middleton v. State,* 187 S.W.3d 134, 142 (Tex.App.-Texarkana, 2006, no pet.).

"the reviewing court is left with a firm conviction that a mistake has been committed." *Robinson v. State*, 851 S.W.2d 216, 227 (Tex.Crim.App.1991) (op. on orig. submission); *accord Hernandez* at 369, 111 S.Ct. 1859. "[I]f an appellate court accepts a trial court's finding that a prosecutor's race-neutral explanation for his peremptory challenges should be believed" at the second stage of the *Batson* procedure, the Supreme Court "fail[s] to see how the appellate court nevertheless could find discrimination" at the third stage. *Miller–El v. Cockrell*, 537 U.S. at 339–40, 123 S.Ct. 1029 (quoting *Hernandez* at 367, 111 S.Ct. 1859).

Courts "review the record of the *Batson* hearing and the voir dire examination in the light most favorable to the trial court's ruling." *Adanandus v. State*, 866 S.W.2d 210, 224 (Tex.Crim.App.1993); *accord Camacho v. State*, 864 S.W.2d 524, 528 (Tex.Crim.App.1993); *Cantu*, 842 S.W.2d at 689.

The "clearly erroneous" standard is "analytically and intellectually the same as" the "supported by the record" standard. *Hill*, 827 S.W.2d at 866; *accord Goode v. Shoukfeh*, 943 S.W.2d 441, 446 (Tex.1997) ("abuse of discretion"). "If supported by the record, including the voir dire, the prosecutor's explanation of his use of a peremptory challenge, the rebuttal by appellant and impeaching evidence, the decision of the trial court will not be clearly erroneous." *Camacho*, 864 S.W.2d at 528. "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Hernandez*, 500 U.S. at 369, 111 S.Ct. 1859. "When the evidence in the record is susceptible to two reasonable interpretations and the trial court's decision is in accord with one of those interpretations, then the trial court's choice between those interpretations may not be deemed clearly

erroneous." *Trevino v. State*, 864 S.W.2d 499, 500 (Tex.Crim.App.1993).

"Under *Batson*, a defendant is permitted to establish from 'the totality of relevant facts,' 476 U.S., at 94, 106 S.Ct., at 1721, that black jurors have been excluded on the basis of race and that the system of peremptory challenges has been operated in a discriminatory fashion." *Holland v. Illinois*, 493 U.S. 474, 516, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990); *accord Williams v. State*, 773 S.W.2d 525, 535 (Tex.Crim.App.1988) (op. on orig. submission) ("Under *Batson*, the totality of the circumstances of the particular case must be examined to determine whether an inference of misconduct by the state has been established.") (quoting *State v. Holder*, 155 Ariz. 83, 745 P.2d 141[, 145] (Az.1987)); *Keeton v. State*, 749 S.W.2d 861, 865 (Tex.Crim.App.1988). "To determine whether the trial court's ruling was in fact 'clearly erroneous,'" the court "examine[s] the entire record...." *Molina v. Pigott*, 929 S.W.2d 538, 545 (Tex.App.-Corpus Christi 1996, writ denied).

"[T]he critical question in determining whether a prisoner has proved purposeful discrimination ... is the persuasiveness of the prosecutor's justification for his peremptory strike." *Miller–El v. Cockrell*, 537 U.S. at 338–39, 123 S.Ct. 1029 (citing *Purkett*, 514 U.S. at 768, 115 S.Ct. 1769). "[I]mplausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination." *Id.* at 339, 123 S.Ct. 1029 (quoting *Purkett* at 768, 115 S.Ct. 1769). Among the factors to consider in evaluating the explanations for a strike are:

- "the prosecutor's demeanor";
- "how reasonable, or how improbable, the explanations are"; and
- "whether the proffered rationale has some basis in accepted trial strategy."

*Miller–El v. Cockrell,* 537 U.S. at 339, 123 S.Ct. 1029.

The Court of Criminal Appeals sometimes "employ[s] a set of factors deemed useful in making a determination that the State's proffered race-neutral reasons are supported by the record, as well as the trial court's findings." *Williams v. State,* 804 S.W.2d 95, 105–106 (Tex.Crim.App. 1991); *see Whitsey,* 796 S.W.2d at 713–14 (op. on orig. submission); *Keeton,* 749 S.W.2d at 868. Those factors are:

1. The reason given for the peremptory challenge is not related to the facts of the case;

2. there was a lack of questioning to the challenged juror or a lack of meaningful questions;

3. Disparate treatment—persons with the same or similar characteristics as the challenged juror were not struck;

4. Disparate examination of members of the venire, i.e., questioning a challenged juror so as to evoke a certain response without asking the same question of other panel members;

5. an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically.

*Williams,* 804 S.W.2d at 106 (citing *Slappy v. State,* 503 So.2d 350 (Fl.Dist.Ct.App. 1987), *aff'd,* 522 So.2d 18 (Fla.1988)).

"As in any equal protection case, the burden is, of course, on the defendant who alleges discriminatory selection of the venire to prove the existence of purposeful discrimination." *Batson,* 476 U.S. at 93, 106 S.Ct. 1712 (internal quotation marks omitted); *see Village of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 270 n. 21, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). The Court of Criminal Appeals has held that the standard of proof is by the preponderance of the evidence: *"Batson,* its progeny, the line of equal protection discrimination cases from which *Batson* was born, and our cases following *Batson* have uniformly held that it is the challenger's burden to prove discrimination by a preponderance of the evidence, not the actor's burden to prove a negative." *Guzman v. State,* 85 S.W.3d 242, 255 n. 48 (Tex.Crim.App.2002). In other words, the defendant must "show, by a preponderance of the evidence, that the prosecutor's strike of [a] juror ... was based on or because of ... discrimination." *Id.* at 255; *accord Tompkins v. State,* 774 S.W.2d 195, 202 (Tex.Crim.App. 1987), *aff'd by an equally divided court,* 490 U.S. 754, 109 S.Ct. 2180, 104 L.Ed.2d 834 (1989) (per curiam).

In reviewing Densey's *Batson* claim, I am not "left with a firm conviction that a mistake has been committed" in the trial court's overruling the *Batson* objection. *Cf. Robinson,* 851 S.W.2d at 227; *Hernandez,* 500 U.S. at 369, 111 S.Ct. 1859.

Densey's trial objection was:

Judge, it's our—it's our position that the State struck two-thirds of the African–American representation on the panel, that Mr. Hall and Miss—Juror No. 1, Mr. Hall, and Juror No. 2, Miss Jones, answered all questions in the appropriate manner.

(2 R.R. at 172.) [16]

The State gave the following reasons as its race-neutral reasons for the strikes:

---

**16.** In Densey's original brief, he argued that the State struck 67% or two of the three blacks in the strike zone. (Densey Br. at 18, 19.) In Densey's Supplemental Memorandum, he argued, "75% of the African–American representation in Appellant's case were struck by the State." (Supp. Memo. at 4.) Especially when dealing with such a small sample (three in the strike zone or four on the whole panel), the difference is not significant.

The State's race-neutral reason for striking Juror No. 1, Richard Hall, Richard Hall knew the defendant and went to school with him. Also, that he has seen crack cocaine and that he is a rehabilitation juror. And the State is going to proceed on a non-rehabilitation theory in this case.

(2 R.R. at 172.)

The State's race-neutral allocation—or race neutral reason for striking Juror No. 2, Audrey Jones, is that she's seen— she knew crack, people that have smoked crack. She is a rehabilitation juror. She also is one of the only jurors, by my count, to put "deterrence" as the No. 3 reason for punishment.

(2 R.R. at 172–73.)

First, Densey complains of the State's striking panelist Hall. As to Hall's acquaintance with Densey, Densey argues: "Panelist Gaines also knew Appellant. Panelist Conerway, who made the jury, said that although she did not know Appellant personally, that she knew Appellant's sister." (Densey Br. at 22 (record citations omitted).)

A panelist's acquaintance with the defendant can be a race-neutral reason for striking the panelist. *See DeBlanc*, 799 S.W.2d at 712, 713.

Hall testified that he was acquainted with Densey from going to school with him:

[Q:] Does anybody else know Mr. Densey?
Mr. Hall? How do you know Mr. Densey?
[A]: From school. Basically through school. We was, like, classmates. I was behind him in class, but we went to the same school.

[Q]: Do you think that this is the kind of jury you want to be in? Do you think you can be fair and impartial, seeing that you know him?

[A]: I believe I can.

[Q]: Okay. You can. Great. Thank you.

(2 R.R. at 48.)

Gaines and Conerway were not as closely associated with Densey as was Hall. Gaines's association with Densey was indirect, through Gaines's brother. Gaines testified as follows:

[Q:] Mr. Gaines, now, you know the defendant, right, in this case?

[A]: Yes.

[Q]: And—Mr. Densey. And how do you know Mr. Densey?

[A]: I grew up with his younger brother.

[Q]: Okay. And—you know, I probably wouldn't want to be on a jury where I knew a friend. I would hate to be put in a position of somebody thinking I might skew it towards this man or worse, convict him and sent him to prison. It would be tough for me to do that. Do you think that this is a case that you should be on?

[A]: I—if y'all pick me, I'd be here.

[Q]: I mean but—you'd be fair, do you think—

[A]: Yes, sir.

[Q]:—seeing that you know him and grew up with him and that kind of thing? Do you think you could fair?

[A:] It wouldn't matter to me.

[Q]: So you can be fair and impartial?

*See* Levy, *Petit Jury Selection and Composition, in* STATE BAR OF TEX. PROF. DEV. PROGRAM, ADVANCED CRIMINAL LAW COURSE 15, at 15–43 through 15–44 (2005).

[A]: Yeah.

(2 R.R. at 47–48.)

Conerway, moreover, as Densey acknowledges, (Densey Br. at 22), testified that she did not know Densey. Conerway testified as follows:

[Q:] Does anybody else know Mr. Densey?

. . . .

Anybody else? Yes, Miss Conerway?

[A]: I know his sister.

[Q]: You don't know him personally, though?

[A]: No.

[Q]: The fact that you know his sister, would that cause you to be unfair at all?

[A]: No.

(2 R.R. at 48.)

The next reason the State gave for striking Hall was that he "ha[d] seen crack cocaine." (2 R.R. at 172.) Hall's testimony is somewhat distinguishable from that of the other panelists to whom Densey points. Hall is the only panelist who expressly testified that he had "seen" cocaine. (*Id.*)

A panelist's acquaintance with persons connected to controlled substances can be a race-neutral reason for striking the panelist. *E.g., Solomon v. State,* 830 S.W.2d 636, 637 (Tex.App.-Texarkana 1992, pet. ref'd) (striking panelist in part for being "acquainted with a family, several members of which had been convicted of drug dealing or possession of drugs" held "not clearly erroneous"); *Logans v. State,* No. 03–99–00348–CR, 2000 WL 1124981, at *3, 2000 Tex.App. LEXIS 5296, at *7 (Tex. App.-Austin Aug. 10, 2000, pet. ref'd) (not

designated for publication) (striking panelists in part for having "known two persons who died as a result of a drug overdose" and for being "related to persons with drug problems" held "racially neutral" explanations).

As to Hall, Densey points to Hall's testimony on voir dire examination by the State:

[Q:] . . . . Do you think crack cocaine is a problem in our community?

[A]: Yes.

[Q]: Okay. Have you had any experience around crack cocaine a lot? Have you seen any?

[A]: I've seen it.

[Q]: You've seen it in the community?

[A]: (nods head.)

[Q]: How do you think crack cocaine use affects our community?

[A]: There are a lot of ways. It causes people to take stuff that you've worked hard for and just causes a lot of problems.

[Q]: Okay. So just some—it's not just the actual using of it. There's other impacts that happen?

[A]: Yes.

[Q]: Some stealing.

Have you ever known anybody that's been a victim of crack cocaine?

[A]: Yes.

[Q]: Okay. Do you have any personal experience on how they act?

[A]: No.

(2 R.R. at 37–38.) [17]

For purposes of comparison, Densey points to the following testimony of the following panelists, (Densey Br. at 21–22):

[Q]: Okay. And do you think the police and the legal system are doing a good job policing crack cocaine?
[A]: Yes.
[Q]: Have you ever known any dealers?

---

**17.** The examination continues as follows:
[Q]: No? Okay. So you probably didn't spend a lot of time with them. Is that a true statement?
[A]: I've seen them.

(1) Weslowski: "[C]rack cocaine 'somewhat of a problem.'"

(2) Bingham: "[E]xperience with a child whose mother was in prison."

(3) Keys: "[C]hildren had friends who were into drugs."

(4) Watson: "[T]wo experiences; one involving witnessing a drug deal in Houston, Texas."

(5) Rogers: "[A]dopted grandchild was born a crack baby." [18]

The prosecutor opened the line of questioning in this way:

[H]ow do you feel about crack cocaine in the community is all I want to know, okay? I want to get your general feeling on it. Some people might not think it's a big deal. Some people may see that it's as a really big deal. And some people might have some personal experiences with it with friends, family members or other people.

[sic] (2 R.R. at 36–37.)

Weslowski, first, testified that he had no experience with drugs or drug users:

[Q]: Okay. Mr. Weslowski, do you think crack cocaine's a problem in our community?

[A]: Oh, I think it's—sure. It's somewhat of a problem.

> [A]: Yeah.
> [Q]: Yeah. And did you ever spend any time with them, get to know them, anything like that?
> [A]: No.
> (2 R.R. at 38.)

18. Other panelists, not noted by Densey, testified similarly:
- Ramirez: "... I don't have any experiences. .... I guess it starts with the young people and they follow up and it goes up to other things. It affects people's habit of wanting to go after something they don't need to do. They'll be working and trying to get something for nothing, where they can make some big bucks." (2 R.R. at 39.)

[Q]: Okay. And do you think the police are doing a good job of policing it?

[A]: Yeah, I think so.

[Q]: And do you have any personal experiences around people you've known?

[A]: No.

[Q]: What about drug use, period? Have you ever had experience with people who—

[A]: Not really, no.

(2 R.R. at 39–40.)

Bingham, next, testified as to her experience with the child of a drug user:

[Q]: What about drug use, period? Have you ever had experience with people who—

. . . .

.... How about you, Miss Bingham?

[A:] I remember—the only experience I've ever had is with a child whose mother is not still in prison, who was a crack baby. And it just—it hurts me to see him when I do see him, because he's having a lot of problems. He's 11 years old. And if someone doesn't really start giving him individual attention that he really needs, he's going to end up in prison, as well. He doesn't understand.

- Wilton: "I don't have any firsthand knowledge, but from what I have experienced or heard about is the totally negative influence. I've had knowledge of a—second-hand, by word of mouth of a crack house in the area, and I've seen what a bad influence that's been. As far as the police force doing a good job in that area, it's still around. The crack house is still there, as far as I know, so I'm not sure that they're doing their job in the force." (*Id.* at 44–45.)
- O'Shea: "... I used to live in Baltimore, so I've seen what—the effects of crack on a big city. There are places in Baltimore that look like a war zone." (*Id.* at 46–47.)

He doesn't comprehend in the same way normal people do because he was born with crack in his system.

[Q]: So he's got a lifetime addiction?

[A]: Well, no, he's not addicted to it now. They weaned him off of it fairly early, but it—it caused a lot of brain damage because she was using it during at least 50% of her pregnancy or more. She was using cocaine and other kinds of drugs. And it's just—he needs someone who understands his problem and to spend time in helping learn, to understand more wording and things like that, to help out there.

And he acts—you know, he acts at how you react. If you're nice to him and you try and you don't get frustrated at him, then he's very, very good. If you get agitated with him quickly, then he doesn't know how to respond. He doesn't know how to react.

[Q]: How do you know this child?

[A]: Well, my grandparents have lived in the community for a long time and have been in the jail ministry, and that's how they knew of him, right after he was born.

. . . .

. . . My mother goes to the women's prison in Bryan and does jail ministry once or twice a week. And through that we met Miss Warren, and just really kind of took this child underneath her wing and has been really trying to help him. But, you know, other than that one incident, I've never had any kind of—you know, I really haven't had to deal with anything like that.

[Q]: You've just seen some of the aftereffects, right?

[A]: Yes.

(2 R.R. at 40–42.)

Keys, next, testified to her experiences with children who used drugs:

[Q:] Miss Keys? Any experiences that you'd like to share, or do you think it's a problem in our community?

[A]: I think it's a problem in a lot of communities, even in our own. I work with children. I teach. I've seen—I have kids of—my own children, one in high school and one in college, and have known that they had friends or known people in high school and beyond that are into drugs and have seen how it's affected their families. Never anything immediate in our family. I've not had that kind of experience. I've seen aftereffects, because like I said, I work with children. I'm a P.E. teacher, so I work with every child on the campus. I've seen the effects afterwards, what happens to children, you know, but as in having a strong opinion—I mean, I think like most people, you know. I'm against it. But I understand that it's out there and that as a community we need to work together to give people the help that we need to; it's so common.

(2 R.R. at 42.)

Watson, next, is the only other panelist mentioned by Densey who might arguably have "seen" cocaine. (2 R.R. at 44.) Watson testified as follows:

[Q]: How about you Mr. Watson. . . . .

[A:] I guess you're talking about personal experience.

[Q]: Yeah.

[A]: I've had two. First, I was approached 15 years ago to represent certain people from Houston. Retired. Overseas.

[Q]: Okay. So we're talking about big offenders?

[A]: I don't know. It fell apart.

[Q]: Okay.

. . . .

[A:] My wife and I were cruising Westheimer in Houston, Texas, one night, and we saw an attempted drug deal that was going down, and we had to flee to a lighted area and call the police.

[Q]: How do you know there was a drug deal going down?

[A]: Well, I guess I surmised that when people who appeared to be Latinos were backing into a street and had open cars and are passing big white sacks.

[Q]: Ah. Okay.

[A]: And then chase you down Westheimer.

[Q]: Oh, they were chasing you down Westheimer?

[A]: Yes, they were.

. . . .

[Q]: That sounds like a drug deal to me.

(2 R.R. at 43–44.)

Rogers, lastly, testified to her experiences with a child of a drug user:

[Q]: Miss Rogers?

[A]: Yes, sir. I've had personal experience with it in my family. What happened, my adopted grandchild was born a crack baby, and he was very thin and he's real limited, so I am—it's bad.

(2 R.R. at 45.)

The last reason that the State gave for striking Hall was that Hall was a "rehabilitation juror" and that the State was "going to proceed on a non-rehabilitation theory in th[e] case." (2 R.R. at 172.) A panelist's "view that rehabilitation is the goal of punishment" can be a race-neutral reason for striking the panelist. *See Adanandus*, 866 S.W.2d at 225.

The Texas Penal Code states its purposes, including the purposes of punishment, as follows, in part:

[T]he provisions of this code are intended, and shall be construed, to achieve the following objectives:

. . . to insure the public safety through:

(A) the deterrent influence of the penalties hereinafter provided;

(B) the rehabilitation of those convicted of violations of this code; and

(C) such punishment as may be necessary to prevent likely recurrence of criminal behavior. . . .

TEX. PENAL CODE ANN. § 1.02 (Vernon 2003).

Densey does not quote Hall's testimony in this regard. (*Cf.* Densey Br. at 22–23.) The prosecutor Greening examined the panel as follows:

[MR. GREENING:] There's four reasons for punishment, and I just want to run these through you real quick, and we'll talk about these in the punishment phase of the trial, but when we—we look at punishment, especially prosecutors, we look at protection of society, number one. We want to protect our people. Retribution, rehabilitation and deterrence. Those are the four—four of them.

If I can get a show of hands.

Now, the protection of society, retribution, which means the punishment shall fit the crime, rehabilitation—we just want to fix the person. Make them a better person. I think I've already asked you about that.

Deterrence. We want to deter other people from making the same mistake. Now, who thinks that deterrence is the number one factor here at issue right now?

[. . . .]

MR. GREENING: Deterrence. Who believes deterrence should be the No. 1 factor here?

What about rehabilitation? Fixing people?

[. . . .]

MR. GREENING: So nobody raised their hand for deterrence.

What about rehabilitation? Fixing people. I believe a man back here, Mr.—

MR. HUGHES: Hughes.

MR. GREENING: Hughes. Does anybody else agree with Mr. Hughes that fixing people is the most important reason?

Mr. Hall, do you agree with that?

MR. HALL: (Nods head.)

MR. GREENING: Fixing people is the most important. Do you agree with that, Miss Jones?

MS. JONES: (Nods head.)

[MR. GREENING:] Miss Caso, you agree with that?

MS. CASO: Yes.

MR. GREENING: And Mr. Moos, you agree with that?

MR. MOOS: I think all four.

MR. GREENING: That people are important. I tend to agree with that, too, Mr. Moos.

I'm sorry. Miss . . .

MS. ANGELE: Angele.

MR. GREENING: Angele. Okay. You agree with that, also.

Is that it?

And Mr. Smith?

MR. SMITH: Yeah. I simply think that rehabilitation is an important part of that, if not the most.

MR. GREENING: Okay. Does anybody else agree with that?

The next one is retribution. Now, I know that some of these are very important. All of them are important, but I'm just trying to get an idea of which is the most important to you as a person when you think about punishment for a crime.

So "punishment shall fit the crime" is retribution. Who thinks that one?

Mr. [ . . . ] Wilton? Anybody else agree with Mr. Wilton?

Protection of society. Who thinks that's the number one? Mr. Moos?

MR. MOOS: Upon retribution.

MR. GREENING: That's punishment shall fit the crime. Do you agree with that?

MR. MOOS: Yes.

MR. GREENING: Who else?

And protection of society, protecting the community. Fifty-one, Mr. Watson. Nineteen, 18, 32, 34—

JUROR: 41.

MR. GREENING: —42, 43, 44, 28, 34, 26, and Mr. Watson—

MR. WATSON: Yeah. I just want to say that all four are as important. That's just for reference.

MR. GREENING: Okay. So, I gather that the rest of the people believe that all four should be used together.

(2 R.R. at 79–83.)

Densey introduced his examination of the panel on the purposes of punishment in this way:

Now, in Texas . . . I have four reasons that we punish here in Texas, or we assess punishment. One, the first, is rehabilitation. That is, to rehabilitate the offender, the person that the jury has determined has broken the law. Rehabilitation is one of the reasons that we, in fact, punish, we assess punishment.

Two is deterrence, okay? Deterrence. To deter, either generally or specifically.

To deter specifically is directed at the offenders themselves, okay? I'm sending a message to the offender that what he did was wrong. And this punishment

that we're assessing to you, be it two years, five years, ten years in the penitentiary, is meant to deter you from future wrongdoing.

The second aspect of deterrence is general deterrence. That's a situation where, for example, if the punishment appears in the newspaper, okay? . . . . The idea of general deterrence is that if an offender reads about it or sees it in the media, that there is a possibility that they will be deterred from future unlawful conduct, engaging in that kind of conduct.

The third reason that we punish as a society is simply retribution. And I call—retribution is just straight out punishment, and the idea that we are punishing for punishment's sake. The idea again, kind of the eye-for-the-eye idea, that, you know, someone who is engaged in this bad conduct just ought to be punished for no reason other than punishment's sake, okay?

Now, what I would like to do is, I'm going to go down the rows, . . . and ask you to rate from the most important to the least important, okay, of those three ideas, okay?

First is rehabilitation. Second is deterrence, either specific or general, okay? And third would be retribution, punishment for punishment's sake. Those three.

Retribution, 1. Deterrence will be 2. Retribution would be a 3, okay?

What I'd like for you to do is to tell me what, [ ] your—or—and 4. I. I'll give you a "4" box of "no opinion," okay? You have no opinion. No opinion one way or the other, "I just don't care to answer it."

Okay. What would be most important to you? One, two, three? One, two, three.

The first is rehabilitation, in terms of goals of the criminal justice system. Two would be deterrence. Three would be .retribution, and four would be "no opinion," okay?

(2 R.R. at 134–36.)

Densey argues:

In addition to Hall, the following panelists articulated rehabilitation as the primary goal of the criminal justice system: Panelist Jones; Panelist Ramirez; Panelist/juror Keys; Panelist/juror Conerway; Panelist/juror Pittman; Panelist Gibson; Panelist Arnold; Panelist/juror Angele; and Panelist Smith. All but Panelist Jones prioritized punishment as follows: first, rehabilitation; second, deterrence; third, retribution. Panelist Jones prioritized retribution over deterrence.

Panelist Ramirez was challenged for cause, Panelist/jurors Keys, Conerway and Pittman made the jury. (RR, Vol.2, pg. 180). Panelists Gibson, Arnold and Smith were struck by the State. In all, three so called "rehabilitation" panelists were not struck by the State and made the jury: Keys, Conerway and Pittman. That these non-minority jurors were not struck by the State despite giving *identical* answers to the *identical* question regarding punishment priorities as minority panelists Hall and Jones is an inconsistency never explained by the State.

(Densey Br. at 22–23.)

Conerway, first, is Densey's weakest case. The prosecutor explained his reasons for striking her on the record.

On examination by the State, Conerway apparently did not answer the prosecutor's question, so the prosecutor took it from Conerway's silence that Conerway "believe[d] that all four should be used together." (2 R.R. at 83.) On examination by

Densey, Conerway testified, "One, two, three," that is, that rehabilitation was most important, followed by deterrence, followed by retribution. (*Id.* at 140; *see id.* at 136.)

Furthermore, the prosecutor expressly argued his reasons for not striking Conerway:

> [T]he reason why the State did not strike Miss Conerway is because she gave good State's answers, her husband is in law enforcement, and—and that is a consideration that we think—I mean, we did locate her—or have her circled as a—as a rehabilitational juror, but I think the fact that her husband's in law enforcement weighs in favor, and to the Blinn officer who I know, so—and I know how he is, so . . .

(2 R.R. at 178.) [19] Conerway testified on examination by Densey concerning potential witnesses:

> [Q:] And finally, Jimmy Jones with the Bryan Police Department. Does anybody know Officer Jones?
>
> . . . .
>
> And Miss Conerway?
>
> [A]: My husband used to work with him. . . .
>
> . . . .
>
> . . . I'd see him occasionally at the hospital.
>
> . . . .

[Q]: Anything about that that would cause you difficulty?

[A]: No. No problem.

[Q]: And I noted that you're a—your husband is with—is he with the police department?

[A]: Yes. Blinn College.

. . . .

[Q]: Okay. . . . . Is that going to—

[A]: No.

[Q]: Your husband being a police officer going to cause any difficulty for you?

[A]. No.

(2 R.R. at 151–53.) [20]

"Certainly, there is no discriminatory purpose inherent in" striking a panelist for having "close friends or relatives in law enforcement." *Smith v. State,* No. 14–96–00047–CR, 1999 WL 211913 at *5, 1999 Tex.App. LEXIS 2725, at *13, *12 (Tex. App.-Houston [14th Dist.] Apr. 8, 1999, no pet.) (not designated for publication); *accord Moton v. State,* No. 14–97–00431–CR, 1999 WL 219195, at *2, 1999 Tex.App. LEXIS 2870, at *6–*7 (Tex.App.-Houston [14th Dist.] Apr. 15, 1999, no pet.) (not designated for publication).[21] Panelists who have "friends or relatives in law enforcement . . . generally make good state's jurors. . . ." *Whitsey,* 796 S.W.2d at 714 (op. on orig. submission).

Keys, next, on examination by the State, apparently did not answer the prosecutor's question, so the prosecutor took it from

---

**19.** Contrary to the State's argument, I do not identify any distinctly "good State's answers" in Conerway's testimony. (*Cf.* 2 R.R. at 178.) Besides the above, and besides Conerway's testimony on her knowing Densey's sister and on the purposes of punishment, (*id.* at 48, 140), Conerway's testimony was that:

- she had no "problem" with the presumption of innocence, (*id.* at 109);
- the burden of proof was fair to the State, (*id.* at 116), and she would hold the State to the burden of proof, (*id.* at 124); and

- she had no "difficulty" with the defendant's not testifying, (*id.* at 130).

**20.** Officer Jones did not testify. (*Cf.* R.R.)

**21.** *See also Guzman,* 85 S.W.3d at 250 n. 28 (prosecutor struck panelist because she had "no connection with law enforcement . . . as a friend of those in law enforcement"); *cf. Godine v. State,* 874 S.W.2d 197, 202 (Tex.App.-Houston [14th Dist.] 1994, no pet.) (panelists asked about "their law enforcement relatives, friends, and acquaintances").

Keys's silence that Keys "believe[d] that all four should be used together." [22] (2 R.R. at 83.) On examination by Densey, Keys testified:

[A]: I'd have to put deterrence and rehab as number one, and then—

[Q]: Retribution, three?

[A]: —retribution.

(2 R.R. at 138.)

Pittman, next, on examination by the State, apparently did not answer the prosecutor's question, so the prosecutor took it from Pittman's silence that Pittman "believe[d] that all four should be used together." (2 R.R. at 83.) On examination by Densey, Pittman testified, "One, two, three," that is, that rehabilitation was most important, followed by deterrence, followed by retribution. (*Id.* at 140; *see id.* at 136.)

The other panelist concerning whom Densey complains is Jones. The first reason the State gave for striking Jones is that Jones "knew crack, people that have smoked crack." (2 R.R. at 173.) Densey points to the State's voir-dire examination by the prosecutor as follows:

[Q:] Miss Jones, do you—have you ever known anybody that's done crack cocaine or seen anybody—

[A]: Yes.

[Q]: And do you have—what are they like? What kind of people are they?

[A]: I don't know what to say.

22. On examination by the prosecutor in this line of questioning, the following exchange occurred:

[MR. GREENING:] I'm just trying to get an idea of which is the most important to you as a person when you think about punishment for a crime.

. . . .

And protection of society, protecting the community. Fifty-one, Mr. Watson. Nineteen, 18, 32, 34—

JUROR: 41.

. . . .

. . . A little bit selfish. Selfish people. (2 R.R. at 38–39.) [23]

Densey argues:

Panelist Jones stated that she had known individuals who had done crack cocaine and they were selfish people. Panelist Jones' "State's friendly" answer to the State's inquiry was similar to the other non-minority panel members not struck by the State who were asked specific questions of this type, specifically, Panelist/jurors Weslowski, Bingham and Keys.

(Densey Br. at 24.)

Weslowski, Bingham, and Keys are more or less distinguishable. They did not testify that they had close associates who used crack. Weslowski testified that he did not have any personal experience with drug use or users. (2 R.R. at 39–40.) Bingham testified to her experience with the child of a crack user. (*Id.* at 40–42.) Keys testified that she knew schoolchildren who used drugs. (*Id.* at 42.)

The other reason that the State gave for striking Jones is that Jones was a "rehabilitation juror," and "also [wa]s one of the only jurors . . . to put 'deterrence' as the No. 3 reason for punishment." (2 R.R. at 173.) Jones testified on voir-dire examination by Densey on the purposes of punishment:

[Q:] What about you, Miss Jones?

MR. GREENING:—42, 43, 44, 28, 34, 26, and Mr. Watson—

(2 R.R. at 82.) The record does not clearly show what panelists correspond to these numbers. (*Cf.* C.R.; R.R.)

23. The examination of Jones continued as follows:

[Q]: They're thinking about getting more crack, right?

[A]: Yes.

(2 R.R. at 39.)

[A]: Number one would be rehabilitation.

[Q]: Okay.

[A]: And two, retribution.

[Q]: Two would be retribution? So three would be deterrence?

[A]: Yes.

(2 R.R. at 136–37.)

Densey argues:

As noted above, despite prioritizing rehabilitation as the primary goal of punishment, non-minority Panelist/jurors Keys and Pittman were not struck by the State. The State also argued that Panelist Jones was one of the only panelists who put deterrence as the number three reason for punishment. (RR, Vol. 2, pg. 172, ln. 23–24). Panelist Jones articulated retribution as her second priority, ahead of deterrence, in her ranking of priorities for punishment. (RR, Vol. 2, pg. 137, lns. 1–6). If the State's punishment theory was non-rehabilitation, as they articulated to the Trial Court, Panelist Jones' answer would be *more* consistent with the State's theory, not less.

(Densey Br. at 24–25.)

Prosecutors commonly believe that jurors who favor retribution are the most pro-State, and those who favor rehabilitation are the least pro-State. Those who favor deterrence are believed to be between those who favor retribution and those who favor rehabilitation.

Viewing the record in the light most favorable to the trial court's finding of no deprivation of equal protection, I cannot say that the trial court clearly erred. I now turn to Densey's second group of arguments.

Next, Densey's motion for rehearing makes several arguments predicated on a distinction between the instant case and the Court of Criminal Appeals' opinion in *Gibson v. Texas. See Gibson,* 144 S.W.3d 530.

Under this heading, Densey first argues, without regard to *Gibson,* that this Court mischaracterized his argument:

The Memorandum Opinion in this case characterized Appellant's arguments as it relates to the pretextual striking by the State of panelist number two, Audrey Jones, as "[the] State did not strike other panelists who had a poor opinion of crack users." *Opinion* at *1.

This was not Appellant's argument. Instead, Appellant argued that it "blinked reality," much as it did in *Miller–El,* that the State would strike a juror who had a poor opinion of crack users in a trial where the defendant was on trial for Possession with Intent to Deliver Cocaine, unless race did, in fact, play a factor.

( [sic] Mot. Reh'g at 3–4 (alteration in Mot. Reh'g)); *see Miller–El,* 125 S.Ct. at 2340.

In this regard, Densey misrepresents the record. Densey did not make a "blinks-reality" argument in either his original brief or his supplemental brief. (*Cf.* Densey Br.; Supp. Br.)

Next, again without regard to *Gibson,* Densey argues under this heading:

The Memorandum Opinion also does not address Appellant's arguments contained in his Supplemental Memorandum that questions pertaining to experiences with crack cocaine stopped after panelist number 11. The two minority jurors for which *Batson* challenges were made were panelist numbers 1 and 2. *Miller–El* pointed to disparate examination of the venire as a basis for the holding in that case. *Miller–El* at 2333.

(Mot. Reh'g at 4 (citing *Miller–El,* 125 S.Ct. at 2333).)

In Densey's Supplemental Memorandum, he argued:

> ... African–American panelist Hall was panelist number one and African–American panelist Jones was sitting next to him as panelist number two. The common race neutral reason given by the State for striking panelists Jones and Hall were their answers to questions pertaining to experience with crack cocaine. As developed in Appellant's Brief, the State stopped asking individual jurors questions pertaining to experiences with crack cocaine after juror number eleven. This demonstrates, Appellant submits, disparate questioning.

(Supp. Memo. at 4–5.)

It is often said that "the State is not required to ask a specified rubric of questions" on voir dire examination. *See Chambers v. State*, 866 S.W.2d 9, 24 (Tex. Crim.App.1993).

The record does not clearly support Densey's argument. The record does not even contain a jury list. (*Cf.* C.R.) Near the conclusion of the prosecutor's line of questioning on that issue, the prosecutor said:

> I don't—I could go through everybody. I mean, you guys are great—people. You've been very talkative and helpful and have helped me a lot, but is there anybody else on the front row that's had an experience that maybe they want to share? Volunteer? Remember, the more you talk, the less likely you're going to end up on the jury. (Panel laughter.) Somebody's going to think something bad about you, you know. So you've got to talk to me. That'll get you to volunteer.
>
> Does anybody have any other experiences?

(2 R.R. at 46.) No panelists responded. (*Id.*) After this, the prosecutor individually questioned two more panelists. (*Id.* at 46–47.)

In order to implicate equal protection, "disparate questioning" must be disparate with regard to race or to a protected class. *See Miller–El v. Cockrell*, 537 U.S. at 332, 123 S.Ct. 1029. "Disparate examination" signifies "questioning a challenged juror so as to evoke a certain response without asking the same question of other panel members." *Whitsey*, 796 S.W.2d at 714 (op. on orig. submission). Assuming that Densey's statement of the facts is accurate, that the State individually questioned the two African–Americans among the first eleven panelists, but did not individually question the other two African–Americans or forty or more non-African–Americans on the panel, does not constitute disparate questioning for equal-protection purposes.

Lastly, under this heading, Densey argues, "The *Gibson* evidentiary record also disclosed credibility decisions the trial judge was required to make not present in this case." (Mot. Reh'g at 4.) The trial court did necessarily make credibility determinations.

This Court's Memorandum Opinion cites *Gibson v. Texas* for the proposition that the standard of review for *Batson* challenges is "clear error." *See Densey*, 2005 WL 1581116, at *1, 2005 Tex.App. LEXIS 5239, at *3; *Gibson*, 144 S.W.3d at 533–34. Densey attempts to distinguish *Gibson* in this way:

> As observed in *Gibson* veniremember number 7 in that case qualified his answer on the comparative analysis issue, the so called "one witness rule" when questioned by the defense. *Gibson* at 534. Unlike the minority juror he was being comparatively analyzed with, veniremember 7 gave assurances on questioning by the defense that he could follow the "one witness rule."

Venireman 7 in *Gibson* justified the State's decision not to strike him by additionally saying that the defendant should testify and "explain his part." This is in contrast to this case, in which the minority juror, Audrey Jones, was *struck by the State* after giving a State friendly answer to a question it later used as its purported "race neutral" reason for striking her. These significant factual differences between *Gibson* and this case indicate the need for credibility decision present in *Gibson* that did not exist in the trial court below.

[sic] (Mot. Reh'g at 4–5 (citing *Gibson*, 144 S.W.3d at 534)); *see Palmer v. State*, 92 Tex.Crim. 470, 471, 244 S.W. 513, 513 (1922) (stating "one-witness rule").[24]

To the contrary, as the Supreme Court and the Court of Criminal Appeals have recognized, credibility evaluations are essential to the *Batson* analysis. *Miller–El* did not change this.[25] It has been said that in "a ruling on a *Batson* claim, ... the trial court's ruling will almost always turn *exclusively* on its evaluation of credibility and demeanor." *Guzman v. State*, 955 S.W.2d 85, 95 (Tex.Crim.App.1997) (Meyers, J., concurring & dissenting) (emphasis in orig.).

The *Gibson* Court expressly held: "The Court of Appeals ... misapplied th[e] 'clearly erroneous' standard of appellate review when it substituted its judgment for the trial court's in deciding that the prosecutor's facially race-neutral explana-tion for striking [a] veniremember ... was a pretext." *Gibson*, 144 S.W.3d at 534. The Supreme Court has held that "[a] state court's finding of the absence of discriminatory intent is 'a pure issue of fact' accorded significant deference." *Miller–El v. Cockrell*, 537 U.S. at 339, 123 S.Ct. 1029 (quoting *Hernandez*, 500 U.S. at 365, 111 S.Ct. 1859). "Deference to trial court findings on the issue of discriminatory intent makes particular sense in this context because ... the finding 'largely will turn on evaluation of credibility.'" *Id.* (quoting *Batson*, 476 U.S. at 98 n. 21, 106 S.Ct. 1712).

In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence will often be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province."

*Id.* (quoting *Wainwright v. Witt*, 469 U.S. 412, 428, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)). "Deference is necessary because a reviewing court, which analyzes only the transcripts from *voir dire*, is not as well positioned as the trial court is to make credibility determinations." *Miller–El v. Cockrell* at 339, 123 S.Ct. 1029. In the analysis of whether the reason for a strike

---

**24.** *See also Lee v. State*, 176 S.W.3d 452, 458 (Tex.App.-Houston [1st Dist.] 2004, pet. granted); *Garrett v. State*, 815 S.W.2d 333, 335 (Tex.App.-Houston [1st Dist.] 1991, pet. ref'd).

**25.** In *Miller–El*, the Supreme Court notes that under the procedural history of that case, "the state trial court had no occasion to judge the credibility of" the State's "explanations at th[e] time because" the Supreme Court's "equal protection jurisprudence then, dictat-ed by *Swain*, did not require it." *Miller–El*, 125 S.Ct. at 2325 (quoting *Miller–El v. Cockrell*, 537 U.S. at 343, 123 S.Ct. 1029) (citing *Swain*, 380 U.S. at 223–24, 85 S.Ct. 824); *see also id.* at 2329 ("[T]he credibility of reasons given can be measured by 'how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.'" (quoting *Miller–El v. Cockrell* at 339, 123 S.Ct. 1029)).

is pretextual, "[t]he term 'pretext' is solely a question of fact; there is no issue of law." *Gibson,* 144 S.W.3d at 533. "Factual disputes almost always turn on witness credibility." *Hanks v. State,* 137 S.W.3d 668, 671 (Tex.Crim.App.2004).

Finding neither of Densey's arguments persuasive, I would overrule his sole ground for rehearing and overrule his Motion for Rehearing.

## POSTLUDE

Maybe the reader will enjoy the irony of Justice Vance's refusal to join this opinion as much as I did. He would not join the Court's opinion which decided the case because he thought it was "perfunctory." *Densey,* 2005 WL 1581116, at *3, 2005 Tex.App. LEXIS 5239, at *7 (Vance, J., concurring note). But he wrote nothing to "assist the litigants, the higher courts, the Bench and Bar, or the public." *Id.*

The motion for rehearing is based entirely on *Miller–El,* which issued shortly before the opinion on original submission in this case. Due to the manner in which the issue was briefed on rehearing, I realized that we were not going to get an adequate *Miller–El* analysis in the briefs submitted to this Court unless we explained how *Miller–El* was going to affect defendants making *Batson* claims. I therefore decided that it would be worthwhile to prepare and explain the type of analysis that will be necessary for the brief of a defendant to present a viable *Batson* claim. And while *Miller–El* did not change the standard of review, it did change what we review and how it should be presented, first to the trial court, and then to the appellate court. This analysis took a lot of time and is extremely record-intensive.

Now that I have prepared the more expansive analysis on this issue, Justice Vance throws a few rocks at the analysis without any real specificity, confuses the distinction between the analysis necessary in a brief with what is an appropriate disposition of the issue in an opinion, and simply concurs in the one-line opinion overruling the motion for rehearing that contains no explanation. He still has not written what he thinks is an appropriate disposition of this issue. He apparently believes that eleven lines are not enough. But if we get the type of briefs that we should, eleven lines in an opinion may very well be excessive.

Maybe now court-watchers will understand why I believe that the best practice, consistent with the rules, is preparing a short, focused memorandum opinion. *See* TEX.R.APP. P. 47.1. Brevity and focus also help limit the areas in which there can be disagreement, and we could use a lot less of that.

BILL VANCE, Justice, concurring.

I cannot join Chief Justice Gray's concurring opinion on rehearing for several reasons. First and foremost, it is almost openly critical of the majority opinion of the United States Supreme Court in *Miller–El v. Dretke,* 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). It relies too heavily on a dissent in that case. It is internally inconsistent, stating in one section that *Miller–El* "did not alter the standard of review of *Batson* challenges on direct appeal" and in another, "[t]here are at least two ways in which *Miller–El* may somewhat alter how Texas appellate courts evaluate *Batson* cases:...." It argues outside the record. And finally, it accused Densey's counsel of misrepresenting the record.

The 49 page concurring opinion is offered as "an example of the type analysis that defense counsel should provide to assist the Court in evaluating a *Batson* issue on appeal," yet the treatment of the issue

in his original Memorandum Opinion occupied exactly 11 lines of text. Perhaps I was right in noting the "perfunctory manner" in which the issues were treated in that opinion. *Densey v. State*, No. 10–04–00049–CR, 2005 WL 1581116, at FN* (Tex. App.-Waco, July 6, 2005, no pet. h.) (Vance, J. concurring note).

I concur in overruling the motion for rehearing.